IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF GABRIELLA N. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GABRIELLA N. ET AL.,

CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

APRIL N., APPELLANT.

Filed July 18, 2017.    No. A-16-507.

Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Korey L. Reiman, of Reiman Law Firm, for appellant.

Joe Kelly, Lancaster County Attorney, and Shellie D. Sabata for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

April N. appeals the order of the separate juvenile court of Lancaster County which terminated her parental rights to the minor children, Josiah H., Beau A. N. (Beau A.), Beau X. N. (Beau X.), and Gabriella N. The juvenile court found that grounds for termination existed under Neb. Rev. Stat. § 43-292(2), (6), and (7), and that the State proved, by clear and convincing evidence that termination of April's parental rights was in the children's best interests. For the reasons that follow, we affirm.

- 1 -

PROCEDURAL BACKGROUND

On September 23, 2013, a petition was filed in the separate juvenile court for Lancaster County, which alleged that April had a medical condition which rendered her unable to care for her five children. She is the biological mother of Josiah, Beau A., Beau X., and Gabriella, as well as Annastasia M., who was subject to the jurisdiction of the juvenile court until March 2016.

An amended petition was filed on October 1, 2013, alleging that April feigned medical conditions which rendered her unable to care for her children.

A second amended petition was filed on December 17 alleging that April reported having various medical diagnoses that negatively impacted her ability to parent her children and that her medical providers indicated no medical basis for the diagnoses she reported. The petition further alleged that Bojo N., the stepfather of the two oldest children, and the father of the three youngest children, was arrested on charges of sexually assaulting one of the children over a period of four years. The petition also alleged that April failed to protect the children from exposure to him. The petition alleged that, for the reasons stated, the children were placed at risk for harm. April entered a plea of no contest to the second amended petition.

April was ordered to participate in a psychiatric evaluation and a psychological evaluation. She was ordered to maintain a safe and stable living environment and to maintain legal means of income. She was ordered to cooperate with family support, to participate in supervised visitation, to inform the Department of Health and Human Services (DHHS) of any and all medication and prescribing physicians, and to take medication only as prescribed. She was ordered not to attempt any unsupervised contact with the children. In July 2014, she was ordered to pay child support in the amount of $166.86 per month.

Efforts to preserve and reunify the family and eliminate the need for out-of-home placement included assessments, evaluations, a pre-treatment assessment, individual therapy, intensive family preservation, psychological evaluations, family support, transportation, and team meetings.

On June 13, 2015, the State filed a motion for termination of April's parental rights. In August 2015, Annastasia M. was placed with her father, and on March 14, 2016, the court sustained the State's motion to terminate jurisdiction over the minor child.

On March 28, 2016, the State filed an amended motion for termination of April's parental rights to the youngest four children. The petition alleged that grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination was in the children's best interests. A formal hearing on the State's motion was held on March 28 through April 1. The court entered an order terminating April's parental rights on April 20, 2016. The court found that the State proved, by clear and convincing evidence that there were grounds for termination of April's parental rights under § 43-292(2), (6), and (7), that April was an unfit parent, and that termination of her parental rights was in the children's best interests. April timely appealed.

FACTUAL BACKGROUND

The Department of Health and Human Services provided Intensive Family Preservation through KVC Behavioral Health to try to keep the children in the home. Jane Gentry, an initial assessment worker for DHHS testified that when she became involved in this case, April appeared

very sick. The intake was for a mother who was ill and possibly dying, so DHHS was working to find a permanent placement for the children. Gentry observed the oldest children helping to take care of April. They made meals, helped around the house, reminded her to take her medication, and the older children provided care and supervision for the younger children.

April told Gentry that she was suffering from Hodgkin lymphoma and was participating in hospice care through Tabitha. Gentry had personally dealt with the same condition, twice, and some of the details that April shared did not match up with what Gentry had experienced. For example, April did not have a port for chemotherapy, which Gentry knew to be fairly standard. April provided the names of doctors who were treating her and names of hospitals where she claimed to be receiving treatment. Much of this information turned out to be false.

April told Melissa Lyle, an in-home clinician for KVC, that she was undergoing treatment for cancer and for seizures. Lyle received information that April's cancer was not documented by a medical professional, and shortly after the children were removed, April reported a tumor in her breast. When Lyle confronted April with medical documentation regarding the authenticity of her alleged cancer diagnosis, April reacted in shock and disbelief. Lyle diagnosed April with "factitious disorder," a disorder in which there are some health symptoms present, but the patient believes them to be much worse than they really are.

The children were placed temporarily with their maternal great-grandfather, Charles, for approximately one week. Charles reported to DHHS that, due to his own needs, he did not feel that he could serve as the children's placement long-term. Other family placements were considered, but multiple family members indicated that they were not in a position to take placement of the children at that time.

None of the children have returned to April's care since they were removed. Josiah went to live with his grandparents in Colorado and the other four children, Annastasia, Beau A., Beau X., and Gabriella, were placed with a family in Lincoln. The foster family eventually gave notice that they could not continue placement of all of the children because they had four other children in the home and it was too difficult to manage each of the children's individual behaviors and needs. Beau A. and Beau X. were moved to the home of a family April knew from church, and Annastasia moved to live with her father. Eventually Beau A., Beau X., and Gabriella were placed with Melissa and Terry W., in Gothenburg, who are considered a kinship placement because the family was familiar with April's family.

After the children were removed, KVC provided family support. Goals for April included allowing the children to take on more age-appropriate roles, for April to meet the needs of the children by supervising them appropriately, and for her to provide for the children's basic needs and improving their behavioral functioning. April showed improvement in her parenting ability in November and December 2013, but not all of the safety concerns were remedied. She was not employed, had no source of income and was living in a house that was at least partially paid for by her church. She received food through church donations and community resources. It was also a goal for her to improve her overall functioning by addressing her health issues.

April lived in several residences during the pendency of this case, including living in a few different apartments, in a motel, and with a boyfriend in a rented home. At the time of the formal hearing, she lived in a three-bedroom trailer in North Platte with her fiance and her grandfather.

April worked for short periods of time at Sonic, Casey's, McDonald's, Pizza Hut, and Tyson Foods. She was employed at a food truck at the time of the formal hearing. The order for child support started in 2014, and despite her employment, she has not made any payments since October 2015.

April frequently reminded visitation workers that she was recording the visits and on one occasion, she expressed her belief that the workers were very opinionated. At team meetings April complained about foster placements and her complaints detracted from the goals and progress of the case. April's complaints were investigated and were determined to be unfounded.

With the exception of a two to three week period when the children were moved from Lincoln to Gothenburg, visits have been consistently provided. Gentry tried to arrange visits so all of the children could attend, which was often difficult because the children were not always in the same foster home. In Gothenburg, supervised visits occurred at a church. Beau A., Beau X., and Gabriella came to each visit, Josiah came once per month, and Annastasia came intermittently. The goals for each visit were for April to provide food for the children, for her to engage with the children, and for her to use appropriate discipline.

Claudia Banda, a family support worker for Pathfinder Support Services testified that she had no safety concerns for the children during visits and it appeared that April and the children were bonded. Concerns were raised that Pathfinder workers were not following the parameters of supervised visitation, including: workers painting a child's fingernails; allowing children to prepare food; and, allowing discussions of reunification. The referral stated the visits should take place in an established venue, but Banda testified that they left the church to go for walks to a gas station or to a nearby park.

Lindsey Leishman, the family support worker for visits with April starting in May 2013, testified that April met the objectives set for her by DHHS. She said April managed the children well during the visits and made progress in her parenting skills. Leishman said she did not observe any safety concerns and expressed her frustration to DHHS that April's case was not progressing, despite April meeting the objectives set for her. Leishman's assessment was only measured by what she witnessed during visitation and did not take into account April's mental health diagnosis or any input from treatment or service providers.

April Waddell testified that she was the case manager for April and the children from July 2014 to November 2014. She testified that there were concerns that Leishman was not being objective or fully documenting what happened during visits. There were also concerns that it appeared Leishman was acting beyond her duty to supervise visitation by providing transportation for April outside of visitation. It was suggested that boundaries had been crossed and April had manipulated her. These concerns were shared with Leishman's supervisors and she was removed from the case.

Brittany Neville, a child and family services specialist with DHHS worked with April and the children from December 2014 to August 2015. Neville testified that April refused some of Neville's requests, such as not giving the children soda at visits because the younger children wet the bed. April was asked to encourage or allow the children to work on homework during visits. Although April initially refused, she eventually incorporated homework time into visits.

April violated visitation rules by attempting to speak with the children privately, talking about this case and her medical needs in front of the children, and speaking negatively about workers and foster families. On one occasion, Bojo called from jail, and April put a call on speaker so he could talk to the children. Bojo had been arrested in July 2013 on charges of sexually assaulting one of April's children over a period of four years, and he was awaiting trial. April was directed to have no contact with Bojo, and she knew that he was not allowed to have contact with the children. Additional workers were present at visits and some visits were cut short because April was not able to parent all five children effectively at the same time.

Gentry testified that she was not in a position to recommend a lower level of supervision for visitation because April continued to violate visitation rules and manipulate the situation and the facts. Neville testified that at no point in her involvement in the case was it recommended that the family reunify because April was always at a high risk, due to not acknowledging or addressing the adjudicated issues. Neville maintained contact with the children's therapists and they did not recommend a step down from fully supervised visits.

Sarah Moran, a child and family services specialist with DHHS worked with April and the children beginning August 6, 2015. She testified that the therapists did not recommend monitored visits and the children's therapist recommended that visits be suspended altogether. Sarah Moran had no confidence that April would follow the rules if the level of supervision was lowered, and was concerned that April did not regularly attend psychotherapy.

One of the goals set for April was to address her mental health needs. April saw multiple psychologists for evaluations and psychotherapy.

Dr. Judith Bothern evaluated April on two occasions, including observing visitation, reviewing documentation and the history of this family. She observed that during visits there was unsupervised contact between April and the children, and the supervisors were doing most of the parenting. Bothern stated that April demonstrated an anti-social personality disorder, meaning she took advantage of her community, individuals, churches, organizations, her own children and neighbors. She was deceitful, impulsive, and did not show remorse for what she had done.

April had reported that she was heavily medicated for one to two years prior to this case and that her memory of this time was "hazy." Bothern stated that the number of medications April was taking could create an amnesia-type situation or memory loss, but neither the medications, nor suffering domestic abuse would cause a personality disorder.

Bothern acknowledged that some individuals with personality disorders can successfully parent children, however April would have to show that she could consistently be honest and responsible for an extended period of time. She said that until or unless April acknowledges her lies and the impact they have had on her children, she will remain a threat to her children. Further, she specifically stated "Until April is able to acknowledge her own issues and this has had the longevity to support that it is real and not just lip service, there are no circumstances under which April should be unsupervised with her children."

Dr. Chris Rathburn, a licensed clinical psychologist, began working with April in April 2014. The primary goal was to address the adjudicated issues; the presenting psychological problems and their negative impact on the children and being able to provide an adequate environment for the children with regard to April's psychological and emotional health. April did

not consistently attend therapy sessions until August 2014. Rathburn testified that April attended weekly between August 2014 and August 2015. Waddell testified that in October 2014, Rathburn reported that April attended about fifty percent of her sessions.

It is undisputed that April did not attend sessions between August 2015 and January 2016. April had moved from Lincoln to Gothenburg and the plan was to establish a professional relationship with a local mental health provider. DHHS provided April with a list of therapy providers in her area, but April did not follow through.

In January 2016, April decided to resume therapy with Rathburn. She stated that she was unable to attend therapy because DHHS did not provide a letter of agreement to pay for services. Waddell testified that April had an active letter of agreement, but that April had refused to provide updated documentation when she changed employers, so the letter expired. Sarah Moran testified that April wanted to see Rathburn for one long therapy session instead of two shorter ones, but DHHS does not provide a letter of agreement authorizing extended sessions. April attended three sessions with Rathburn between January 2016 and March 2016.

Rathburn stated that it is important for April to admit and take ownership of her lies about having cancer. He testified that with appropriate support and intervention, April has the capacity to provide a minimally adequate environment for child care. However, despite having the capacity to achieve this goal, Rathburn stated that April is not on the path to reach it because she is not attending regular therapy and there has been no progress in starting family therapy. Based on the information available to him, Rathburn was not in a position to recommend family therapy. The children's therapists did not recommend family therapy because they did not believe it would be in the children's best interests.

Rathburn asked Dr. Robert Arias to evaluate April because of her reports of memory loss. Arias conducted a neuropsychological evaluation on March 17, 2015. Arias opined that April intentionally fabricated symptoms and told people that she had cancer, even though she denied openly misleading anyone for secondary gain. Arias did not find any impairment with regard to memory issues or amnesia, and his review of April's condition led to a malingering diagnosis. Malingering occurs when a person claims to have an illness or injury for a specific purpose, including secondary or financial gain.

Arias stated that it is possible for a person diagnosed with malingering to be a good parent. Arias did not evaluate April's children, but said that if there is a situation where a parent is malingering and there are demonstrable effects on the children, then it is "probably more common than not" that the parent's condition is harming the children psychologically.

Annastasia testified that her mother told her that she had cancer, that she had fibromyalgia, and that it was hard for her to move. April said she had lymphoma, breast cancer, and tumors in her neck. On one occasion, April indicated to Annastasia that she received chemotherapy at a blood donation center, information that Annastasia later learned to be false. Annastasia and Josiah shared the responsibility of helping with medication, food, dressing, and helping April to the bathroom. Sometimes Annastasia and Josiah stayed home from school, because April could not drive, and they provided care for April and the younger children.

After this case began, Annastasia formed a relationship with her father. Previously, when Annastasia asked April about her father, April indicated that she was conceived as a high school

mistake, that her father hated her and he did not want her. Annastasia learned later that this was not accurate. Annastasia's father testified he had very little contact with her from 2000 to 2015, but that he and his family had made efforts to maintain contact. He said he had difficulty keeping track of where April lived, and April told him that she hated him and wrote letters to him and to his family stating that Annastasia hated them too.

Annastasia began living with her father in 2015 and he now has full legal and physical custody. She testified that she has lasting emotional effects from her time living with her mother. She feels like she was not able to "be a kid." She is now able to fully participate in school and extracurricular activities.

Josiah's grandmother testified that April told her that she had cancer and only had a few months to live, and asked her to take care of Annastasia and Josiah after her death. The grandmother testified that Josiah reported sexual abuse by Bojo and struggles with flashbacks, nightmares, and behavioral issues. He is participating in trauma-based therapy, and was very angry when he found out that April had lied about having cancer. Josiah's grandparents believe that his relationship with his siblings is important and will continue to facilitate contact with them in the future.

Terri Moran, a licensed independent mental health practitioner and certified professional counselor testified that she began seeing the three youngest children for outpatient therapy in October 2015. She said the children are dysregulated, meaning their emotions are highly disorganized, they are very reactive, easily angered and upset, and have little ability to self-regulate or calm themselves down. The children also struggle with anger, aggression, bed-wetting and nightmares.

Terri Moran opined that the children are too dysregulated to work on any trauma-related goals. She set goals with each of the children including working on listening and attention skills, following directions, respecting others' personal space, and managing angry and destructive outbursts. Terri Moran testified that each of the children needs permanency and stability in an atmosphere that promotes a strong sense of social and emotional growth, and offers help with social and emotional regulation. She testified that the needs of the children are being met in their current foster home, but it is not in their best interests to continue in the foster care system. She testified that the children are loyal to their mother, but she did not believe that they could safely return to April's care.

Sarah Moran stated that the current foster placement meets the children's behavioral and mental health needs and their needs for structure and discipline. She did not believe that April could meet the children's needs in the same way, now or in the future, and she observed that April was not managing her own mental health. She expressed her opinion that the children need permanency and she did not believe it was in the children's best interests to continue in foster care, given the length of time they have been out of the home.

Gentry observed that April did not demonstrate that she had remedied any of the adjudicated issues, she had not addressed her mental health needs, and she had not admitted to being dishonest about her medical diagnoses. She opined that April had not made any meaningful progress toward reunification, including the ability to maintain stable housing and consistent employment.

April testified that in 2013 she was struggling to work and provide for the children and she began taking a number of medications for conditions including anxiety, depression, seizures and fibromyalgia. She took muscle relaxers, hydrocodone, oxycodone, and antidepressants. She told Bojo that she had cancer, hoping that he would treat her better, and she allowed Bojo, the church, and the children to believe that she was dying of cancer. She testified that she feels "horrible" and is trying to take responsibility for her actions and she is currently trying to live her life without medication. She testified that she lied during her psychological evaluation, even though she was in therapy sessions to address the need to be honest in settings related to medication and her mental health.

## ASSIGNMENTS OF ERROR

April asserts the court erred in determining that she continuously neglected her children, and in finding that the State had made reasonable efforts to preserve and reunify her family. She also asserts the court erred in determining that termination of her parental rights was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

## ANALYSIS

*Grounds for Termination.*

The bases for termination of parental rights in Nebraska are codified in § 43-292. Section 43-292 provides 11 separate conditions, any of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T., et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating April's parental rights to Josiah, Beau A., Beau X., and Gabriella, the juvenile court found that the State proved by clear and convincing evidence that: (1) April substantially and continuously neglected to give the children necessary parental care and protection (§ 43-292(2)); (2) reasonable efforts failed to correct the condition which led to the adjudication (§ 43-292(6)); and, (3) the children had been in an out-of-home placement for 15 or more of the most recent 22 months (§ 43-292(7)).

April does not contest the juvenile court's finding that grounds for terminating her parental rights existed under subsection (7) of § 43-292; she asserts only that the State failed to prove by clear and convincing evidence that the State did not prove that grounds for termination existed under subsections (2) and (6).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

The children were removed from April's care in September 2013. They were placed in foster care and were not returned to April's care at any time prior to the filing of the State's supplemental petition and motion for termination of April's parental rights in June 2015. Our review of the record clearly and convincingly shows that the children have been in out-of-home placement for at least 15 of the most recent 22 months and that grounds for termination of April's rights under § 43-292(7) were proved by sufficient evidence. Therefore this court need not review the court's findings that grounds for termination existed under § 43-292(2) or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

The juvenile court found the State established by clear and convincing evidence that termination of April's parental rights was in the children's best interests. April asserts the juvenile court erred in reaching this conclusion.

A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Alec S., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which as caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests' analysis and the parental fitness analysis are separate inquiries, but each examines the same underlying facts as the other. *Id.*

The evidence demonstrates that April is unfit and that termination of her parental rights is in the children's best interests. There is no dispute that April has serious mental health needs, but it is her management, or, rather, her failure to manage her condition, which has led to the current situation.

April has been evaluated by multiple mental health professionals and each has stated reservations with regard to April's ability to safely parent the children. It is well-documented that April needs consistent, sustained therapy. April's therapist, Rathburn, testified that, with appropriate support and intervention, April has the capacity to provide a "minimally adequate environment" for child care. He stated that although she has this capacity, she is not currently on the path to reach her goals because she is not regularly attending therapy and there has not been any progress in starting family therapy. He stated that it is important for April to take ownership of her lies about having cancer. Although April attended some of her scheduled therapy sessions, she did not attend with the frequency recommended by her treating physicians, and her participation in therapy in the months leading up to the termination hearing was limited.

April had sufficient opportunity to comply with the reunification plan, by participating in therapy and visitation with the children, and by maintaining a safe and stable home environment. April has maintained regular employment and housing, but her history includes many jobs held for short periods of time, and multiple residences in various locations. The court found this evidence does not suggest that April has become more stable in the months leading up to trial.

At the time of the hearing on the State's motion to terminate April's parental rights, April had not explicitly acknowledged her deception, and the detrimental effect that her false health claims had on her children. She did not appear take ownership of her behavior until she testified at the termination hearing. We recognize that April has made some progress toward her goals, but, the Nebraska Supreme Court has held that the last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Alec S., supra.* Further, in the order terminating Aprils' parental rights, the court noted several examples of conflicts between April's testimony and the testimony of individuals she interacted with throughout the course of this case. Each of the examples undermines the veracity of April's testimony and support the court's findings that April failed to make sufficient progress to resolve the adjudicated issues.

Multiple witnesses specifically testified as to the children's best interests. Sarah Moran testified that she did not believe that April could meet the children's needs now, or in the future, and she observed that April was not managing her own mental health. She expressed her opinion that the children need permanency and she did not believe it was in the children's best interests to continue in foster care, given the length of time they have been out of the home.

Gentry observed that April did not demonstrate that she had remedied any of the adjudicated issues, she had not addressed her mental health needs, and she had not admitted to being dishonest about her medical diagnoses. She opined that April had not made any meaningful progress toward reunification, and Gentry was not ever able to recommend that the level of supervision at visits be anything other than fully supervised.

Neville testified that at no point in her involvement in the case was it recommended that the family reunify because April was always at a high risk, due to not acknowledging or addressing the adjudicated issues.

Terri Moran, the therapist for the three youngest children, testified that they are working to address their individual challenges and needs, but their behavior remains highly dysregulated. She said that each of the children needs permanency and stability in an atmosphere that promotes a strong sense of social and emotional growth, and offers help with social and emotional regulation. The children's needs are being met in their current foster home, but it was her opinion that it is not in their best interests to continue in the foster care system. She opined that the children are loyal to their mother, but she did not believe that they could safely return to April's care.

It is clear from the record that the two oldest children were expected to take on roles as caregivers for April and the youngest three children. Annastasia testified regarding the impact April's behavior has had on her life, and Josiah's grandmother detailed the challenges he has faced as a result of April's decisions.

The children deserve permanency, and, at the time of the hearing, the children had been in the State's care for approximately two and a half years. During that time, April had not even progressed to being allowed visitation at a level lower than fully supervised. Although she regularly participated in visits, there are numerous concerns regarding her ability to follow clearly established rules and guidelines for interacting appropriately with the children.

Because much progress must still be made before April would be trusted with the care and custody of her children, they would be left to languish in foster care for an unknown amount of

time with no guarantee of reunification. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S., supra.* We conclude that the juvenile court did not err in determining that April was unfit and finding that the State showed by clear and convincing evidence that termination of April's parental rights was in the children's best interests.

## CONCLUSION

Upon our de novo review of the record, we conclude that the State adduced clear and convincing evidence that termination was in the children's best interests. We affirm the decision of the separate juvenile court of Lancaster County.

AFFIRMED.