IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

IN RE INTEREST OF JOHN M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JOHN M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JOHNNY M., APPELLANT.

Filed December 27, 2022.    No. A-22-270.

Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Joseph C. Bradley, of Bradley Law, P.C., L.L.O, for appellant.

Lindsey Stennis, Deputy Douglas County Attorney, and Curtis Cook, Senior Certified Law Student, for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

### INTRODUCTION

Johnny M. appeals from the order of the separate juvenile court of Douglas County, terminating his parental rights to his minor child. The court found that termination of Johnny's parental rights was proper under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination of his parental rights was in his child's best interests. Following our de novo review of the record, we affirm.

### STATEMENT OF FACTS

Johnny is the father and Ena M. is the mother of John M., born in February 2012. Ena is the mother of three additional minor children, who have a father other than Johnny. The Nebraska

Department of Health and Human Services (the Department) received an intake at the end of January 2019, indicating that Ena had been arrested on charges of robbery and false imprisonment; two of her children (an adult child and one of the minor children other than John) were also arrested. The intake also indicated Ena's drug use and the unclean condition of her residence. The intake led to the removal of the children from Ena's care and their placement in the Department's custody on January 29. The children have all remained in out-of-home placements since that time. Prior intakes for the family involved concerns of sexual abuse, illicit drug use, and "unlivable living conditions." Ena's parental rights to all four children were terminated in the course of these proceedings. The State also sought termination of the other father's parental rights, but those proceedings had not yet concluded by the time Ena's and Johnny's parental rights were terminated. The other father and Ena are not involved in the present appeal, and we reference them and the additional three children only as necessary.

On January 29, 2019, the State filed a petition in the juvenile court, alleging that all four children were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of Ena, which placed them at risk for harm. Specifically, the State alleged that Ena was currently incarcerated; had failed to provide proper supervision appropriate to the children's age and development; had engaged in physical violence in the children's presence; had failed to provide them with proper parental care, support, supervision, and/or protection; and had failed to provide them with safe, stable housing. The court entered an order adjudicating the children as juveniles within the meaning of § 43-247(3)(a) with respect to Ena on March 25.

On May 29, 2019, the State filed a supplemental petition in the juvenile court alleging that John was at risk for harm and lacked proper parental care by reason of the fault or habits of Johnny. The State specifically alleged that Johnny had two criminal warrants out for him issued in April 2018; was currently facing jail time; had failed to provide John with proper parental care, support, and/or supervision; and had failed to provide him with safe, stable housing. That same day, the court entered an order placing John in the Department's temporary custody, with placement to exclude Johnny's residence.

The juvenile court continued John's temporary custody with the Department following a first appearance and protective custody hearing with respect to the supplemental petition on June 11, 2019. On August 12, the court entered an order adjudicating John as a juvenile within the meaning of § 43-247(3)(a) with respect to Johnny.

Following a review and permanency planning hearing in February 2020, the juvenile court ordered Johnny to complete a co-occurring evaluation; maintain safe, stable housing; obtain and maintain a legal source of income and provide monthly proof to the case manager; and consistently participate in supervised visitation in a neutral location with his child. Similar orders were entered following review and permanency planning hearings in July 2020 and June 2021. Following the July 2020 hearing, the permanency objective changed from reunification to a concurrent plan of reunification/adoption. And, in June 2021, the permanency objective was changed to adoption.

On September 16, 2021, the State filed a motion to terminate Ena's parental rights to all four children, as well as a motion to terminate Johnny's parental rights to John. In the motion seeking termination of Johnny's parental rights, the State sought termination of Johnny's parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7). With respect to § 43-292(6), the State

alleged that reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to John's adjudication, in that Johnny had failed to progress to unsupervised visitation, failed to complete a co-occurring evaluation, failed to maintain a legal source of income and provide proof to the case manager, failed to maintain consistent communication with case professionals, and failed to avail himself of the services offered to him in order to reunify with his child.

Trial on the motions to terminate Ena's and Johnny's parental rights was held before the juvenile court on January 21 and 25, 2022. The parties offered testimony from multiple witnesses, and the court received various documentary exhibits. We have summarized only that evidence relevant to the termination of Johnny's parental rights to his child.

John had resided continuously with his foster mother, his paternal grandmother, for approximately 2 years. The grandmother indicated that John was a happy, active, and energetic child and that he had done "average" in school while in her care. At the time of her testimony, visitation was not occurring between John and his father, although there had been visits in the past. The most recent visit between John and Johnny occurred via telephone rather than in person. The grandmother did not recall when the last visit had occurred. At some point, Johnny was receiving supervised visits through an agency that picked John up for the visits, but the agency eventually discharged Johnny from its service. During the approximately 3- to 6-month period when such visits occurred, Johnny did cancel visits, and the grandmother felt that this affected John, although he did not state this verbally. The grandmother expressed some confusion about the nature of the supervised visitation that was supposed to be occurring after Johnny's discharge by the agency, testifying that she did not receive "valid clarification" on the parameters of such visitation from the case manager. The grandmother stated Johnny had made attempts to contact John by telephone, but she did not allow phone contact to occur. John was very involved in sports activities, but Johnny had attended only "a couple" of John's sports events. The grandmother indicated that Johnny never called to ask the outcome of any of John's games, but that Johnny "asks all the time" whether he can attend those events. She testified further, "But for the safety of [Johnny and John], he can't go" because John "has to have supervised visits." The grandmother scheduled and took John to all his medical appointments while he was in her care. She indicated that Johnny never attended any of these appointments.

Michaela Martins was the case manager assigned to the case from October 2020 to October 2021. Martins testified that Johnny's agency-supervised visitation was to be in his residence initially, but then was switched to a neutral location. Johnny never progressed to unsupervised visits while Martins was assigned to the case. Visits went well when they did occur, but there were multiple cancellations and scheduling conflicts. According to Martins, Johnny's visits were supposed to last for 2 hours, but with "[n]o call-no shows," visits would be ended early or they would "start really late," leaving only 10-15 minutes of the scheduled time for the visit. Johnny was discharged by one supervising agency due to his "[l]ack of engagement," meaning that visitation was inconsistent and Johnny was not making efforts to participate in the visits or work with the agency to ensure that visits occurred.

Martins testified that she spoke with Johnny more than once about completing the court-ordered co-occurring evaluation. Although Johnny reported scheduling or rescheduling the appointment, during the time Martins was assigned to the case, he did not complete the evaluation.

Also, Martins asked Johnny whether he was employed; he reported that he was working and mentioned his employer (Martins recalled it being "some sort of temp agency"). He never provided her with any proof of his income.

Martins testified that there were periods when the communication between her and Johnny was inconsistent. She indicated that Johnny would cancel scheduled meetings, and his contact information changed on a "pretty frequent" basis. According to Martins, Johnny's failure to maintain consistent communication meant she could not set up any additional services if needed, family team meetings could not be held to discuss progress or barriers to reunification, and Johnny was unable to progress in completing his court orders.

Johnny's lack of progress, engagement, and failure to complete court-ordered services kept Martins from recommending that Johnny's child be placed with him. Martins expressed concern because there was a lack of bonding time with Johnny and the child and an uncertainty about Johnny's ability to meet the child's basic needs. While Martins was assigned to the case, Johnny did not demonstrate any meaningful efforts to place himself in a position to parent his child. She noted that Johnny was incarcerated for about 3 months of the period she was assigned to the case, which presented a barrier to reunification. Martins' permanency recommendation as of December 2020 had been reunification with a concurrent plan of adoption, and she continued to recommend adoptive planning up until her time on the case ended. Martins testified that termination of Johnny's parental rights was in his child's best interests.

Cindy Johnson has been the case manager supervisor assigned to this case since November 2021. She also testified about Johnny's lack of progress in completing the case plan. Johnny did not progress beyond supervised visitation in a neutral location during her time supervising the case. Johnson testified that Johnny had not "recently presented himself to be assessed" and had not been able to provide for his child or be a part of his life. According to Johnson, Johnny did not complete the court ordered co-occurring evaluation or provide any proof of his income. She also noted that Johnny had not returned any of her employer's contacts over the preceding 4 months. Johnson testified that Johnny was not in a position to take placement of his child because he had not "allowed himself to be assessed properly" and was not engaging in any of the court services requested of him. While the case had been assigned to Johnson, Johnny had not demonstrated a meaningful effort to place himself in a position to parent his child. Johnson testified that a permanency objective of adoption and termination of Johnny's parental rights was in his child's best interests.

Johnny testified on his own behalf. He testified about his compliance, or noncompliance, with the various court orders concerning him. With respect to visitation, Johnny testified to his understanding that the initial supervising visitation agency was supposed to work around his schedule. According to Johnny, while the agency did so initially, he eventually had to work around the agency's schedule. He testified further that once his mother took over as the visitation supervisor, he was supposed to be able to contact her to arrange for visitation in a neutral location. According to Johnny, however, his mother did not allow visitation to occur. He testified that he did let the case workers know, but that the issue of his mother not allowing him visitation was not resolved. Johnny testified he had most recently called the current case worker 3-4 days prior to his testimony about visitation and was told to contact his mother. He stated that he asked the case worker to call because Johnny's mother will not answer his calls. Johnny did not think his mother

answered the case worker's call either. Johnny testified that the last time he visited John was on November 14, 2021, (after his release from incarceration for 2 months following a fraud conviction in Douglas County). He indicated that his mother did not answer when he called to arrange the visit, but that when he "just showed up," she did allow the visit.

Johnny testified that he did complete a co-occurring evaluation during his incarceration, but he stated that the Department did not accept that evaluation. According to Johnny, he had a co-occurring evaluation set to take place during the week following the termination trial. He acknowledged that it took a long time to complete the evaluation because he had canceled "maybe two times." He also admitted that he would have had time to complete an acceptable evaluation during the course of this case, because his work mainly involved cutting grass, which did not occur during the winter.

Johnny is self-employed, running a lawn mowing business; he also works on decks, bathrooms, and kitchens; and he receives Social Security income. According to Johnny, none of the case workers ever asked for proof of his employment, and they never asked about his Social Security benefits, which he had been receiving since 2009. He stated that if asked for such proof, he would have provided it. Johnny admitted that he never provided proof of his income, taxes, or Social Security benefits during the course of the case, although he again stated that he was never asked to do so.

Johnny attributed his lack of consistent communications with case professionals to the fact that he "freelanc[ed], which made scheduling difficult, as well as changeovers in case workers assigned throughout the case. He also stated that although he would miss scheduled meetings, it was difficult to reschedule and that case workers would not always respond to his text messaging communications. He testified that his most recent communication with the current case worker occurred about 3 or 4 days prior to the termination trial. He stated that he had spoken with that case worker twice in the approximately 3 weeks the case worker had been assigned to the case. As to the previous case worker, Johnny testified that "you could only text her" and that he was "[s]ometimes, but not really" successful in communicating with her.

Johnny did not believe it was in his child's best interests for his parental rights to be terminated. He asked that he be given more time to complete the court orders.

On March 18, 2022, the juvenile court entered an order terminating Johnny's parental rights to John. The court found the testimony of the grandmother, Martins, and Johnson to be "independent, credible, probative, and entitled to weight." The court found Johnny's testimony "sometimes credible, but compromised during cross-examination." It also found that his testimony corroborated the evidence presented by the State. The court found clear and convincing evidence for termination under § 43-292(2), (6), and (7) and that Johnny was unfit to parent and termination of his parental rights was in his child's best interests.

## ASSIGNMENTS OF ERROR

Johnny asserts that the juvenile court erred in finding by clear and convincing evidence that (1) statutory grounds for termination under § 43-292(2) and (6) had been satisfied and (2) termination of his parental rights was in his child's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

*Statutory Grounds.*

Johnny asserts that the juvenile court erred in finding by clear and convincing evidence that statutory grounds for termination under § 43-292(2) and (6) had been satisfied. The juvenile court found clear and convincing evidence of statutory grounds to terminate Johnny's parental rights to his child under § 43-292(2), (6), and (7). Johnny does not challenge the court's finding with respect to § 43-292(7), and upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Johnny's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of his parental rights exist under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*.

Johnny's child was removed from the care of the child's mother and placed in the Department's custody on January 29, 2019, and has been in out-of-home placement continuously since that time. A motion to terminate Johnny's parental rights was filed on September 29, 2021, at which time his child had been in out-of-home placement for 32 months, and by the start of the termination hearing on January 21, 2022, he had been in out-of-home placement for nearly 36 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Johnny's parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) and (6), but we do not need to consider whether termination of Johnny's parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought under

subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015).

*Best Interests and Unfitness.*

Johnny asserts that the juvenile court erred in finding by clear and convincing evidence that termination of his parental rights was in his child's best interests. Johnny argues that termination of his parental rights would deprive his child of the opportunity to share in and develop a healthy relationship with Johnny. He also argues that he was not "given substantive opportunities to demonstrate his ability to parent [his child]" as he was "only afforded visitation at times that were not convenient." Brief for appellant at 16. He also notes that he was denied visits by his mother, argues that he was never asked for proof of his income, and notes the steps he took toward completing a co-occurring evaluation following his release from jail. Johnny also points to testimony from his mother indicating that the child always wants to know if Johnny will be attending the child's sports events and that Johnny frequently calls her. Johnny also notes his own testimony that his son loves him and that it is "[Johnny's] job to take care of him." Finally, he argues that the State has not met its burden of showing he is an unfit parent.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

The evidence shows that Johnny made minimal efforts to comply with the case plan developed by the Department. While there was some confusion over the details of how visitation was to occur once Johnny's mother took over supervision of the visits, Johnny's visitation while supervised by an agency was inconsistent. Visits were canceled or cut short due to Johnny's failure to call, appear, or late arrival. And, while he had recently taken steps toward completing the co-occurring evaluation in the period between his release from jail and the termination trial, last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Johnny's

communication with case professionals has been inconsistent, and some of his testimony contradicted that of other witnesses, whom the juvenile court found to be credible. We give weight to the juvenile court's findings in that regard. See *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022).

Johnny clearly has not placed himself in a position to have his child returned to his care. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S., supra*. We conclude that the State showed by clear and convincing evidence that Johnny was unfit and that termination of his parental rights was in his child's best interests.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Johnny's parental rights to his minor child.

AFFIRMED.