IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF PAYTON P.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF PAYTON P., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DANELLE B., APPELLANT, AND ORREY P., APPELLEE, AND
CYNTHIA W. AND DANA W., INTERVENORS-APPELLEES.


Filed April 30, 2019.    No. A-18-733.


Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Jessica R. Meyers, Deputy Scotts Bluff County Public Defender, for appellant.

William E. Madelung, of Madelung Law Office, P.C., L.L.O., for appellee Orrey P.

Katy A. Reichert, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., for intervenors-appellees.


PIRTLE, ARTERBURN, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Danelle B. appeals from an order of the Scotts Bluff County Court, sitting as a juvenile court, that terminated her parental rights to her child, Payton P. Orrey P. attempts to cross-appeal from the same order that also terminated his parental rights to Payton. Cynthia W. and Dana W., Payton's maternal grandmother and stepgrandfather, also appeal the termination of Danelle's

parental rights. Based on the reasons that follow, we affirm the termination of Danelle's and Orrey's parental rights to Payton and we dismiss Cynthia and Dana's appeal for lack of standing.

BACKGROUND

Danelle and Orrey are the biological parents of Payton, born in April 2013. On May 2, 2017, the State filed a petition to adjudicate Payton pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) alleging that her parents' use of controlled substances placed her at risk of harm and/or deprived her of necessary parental care, and that she lacked safe and stable housing. Payton was removed from her home on May 1 and has not returned since. On May 16, the State filed an amended juvenile petition which included the allegations in the original petition and added an allegation that Orrey neglected to provide Payton with proper parental care, support, or protection. On July 12, the State filed a second amended petition alleging only that Payton lacked safe and stable housing through no fault of Danelle and Orrey. Danelle and Orrey both admitted to the allegation in the second amended petition, which the court accepted. Payton was adjudicated under § 43-247(3)(a).

On April 3, 2018, Cynthia and Dana filed a complaint to intervene, which the court granted.

On April 19, 2018, the State filed a motion to terminate Danelle's parental rights to Payton, alleging that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016), and that termination was in Payton's best interests. On the same day, the State filed a motion to terminate Orrey's parental rights, alleging that termination was appropriate pursuant to § 43-292(1), (2), and (6), and that termination was in Payton's best interests.

In June 2018, trial was held on the motions to terminate Danelle's and Orrey's parental rights. As explained later in this opinion, we will not address the termination of Orrey's parental rights, and as such, the evidence discussed below only pertains to Danelle.

Allison Claussen, Payton's foster mom, was the first witness to testify for the State. Payton was placed with her on May 1, 2017, and was 4 years old at the time. Claussen testified that when Payton first arrived she was withdrawn and shy, had erratic behavior and tantrums, was still in diapers, had problems sleeping, would not sleep alone, and would not eat meals and only wanted to snack on "junk food." Claussen testified that she supervised visits between Danelle and Payton in her home for about the first 4 months. The visits took place twice per week. She testified that during the time she supervised visits, Danelle did not play or interact with Payton. Payton spent a lot of the visitation time either watching something on her tablet or Danelle's phone, or watching television. Claussen also observed that when Danelle did interact with Payton it was not at her age level. She testified that Danelle fell asleep during one visit and had problems walking and functioning at another visit.

Claussen testified that in late January or early February 2018, Payton regressed from the progress she had made since May 2017. She testified that Payton became withdrawn again, had a lot of anxiety, was having more tantrums, and regressed on her potty training. Claussen testified that during this time, Danelle had daily visits scheduled with Payton, but Danelle was not being consistent in attending those visits. By the end of March or beginning of April 2018, Payton had progressed back to where she was before the January/February regression. Payton's turnaround

coincided with a reduction in Danelle's visits. Her visits had been reduced to once per week, and there were family therapy sessions once per week as well.

Claussen testified that Payton functions better when her schedule is consistent; she is happy, does not have tantrums, is well-behaved, and interacts with other children. She testified that Danelle has not been able to provide Payton with a consistent schedule.

Cassie Beasant, Payton's caseworker since May 2017, was next to testify. Beasant testified that Payton was removed from the home based on methamphetamine use by Danelle and Orrey. The case plans that Beasant had prepared over the course of the case were admitted into evidence. Beasant testified that the goals set for Danelle had not changed throughout the case. The goals included: maintaining safe and stable housing free from illegal substances and unsafe individuals, working on and modeling protective parenting skills, and taking all of her medications as prescribed. Beasant testified that Danelle has submitted to a medication evaluation, a substance abuse evaluation, and a psychological and parent capacity evaluation. The psychological and parent capacity evaluation report stated that unless Danelle's past history was addressed, she would continue to have relationships that place her and Payton in harm's way. The report recommended individual therapy and family therapy. At the time of trial, Danelle had only been to three individual therapy sessions. Beasant testified that she talked with Danelle about the need to go to therapy from the time it was recommended in December 2017 until Danelle went to her first session in March 2018. Danelle had been participating in family therapy since November 2017.

Beasant testified that at the time of trial, Danelle was in a relationship with an individual named Chris, and that he had been living in Danelle's home since at least March 2018. Chris has a criminal history that includes multiple assault charges in the past 10 years, the most recent being 3 years ago. Beasant testified that she talked to Danelle about Chris in April or May and expressed her concern about his past and that Danelle told her she would have whomever she wants in her home and she did not believe Chris had the criminal record Beasant claimed he had.

Beasant testified that Danelle completed "Circle of Security" parenting course in summer 2017, but that she has not implemented the skills that she learned. Beasant testified that Danelle had recently been attending most of her scheduled visitations, as well as most of Payton's medical appointments. Beasant testified that she had some concerns about the supervised visitations, including Danelle's lack of redirection of Payton, lack of interaction with Payton resulting in Payton playing alone, and the nonnutritious foods offered by Danelle. She testified that Danelle's lack of interaction with Payton has not changed during the course of the case. Beasant further testified that Payton acts out toward Danelle and is disrespectful at times. Beasant testified that Danelle had fallen asleep at two visits, which Danelle attributed to pain medication and not sleeping well at night. She also testified that Danelle treats Payton like an adult friend, rather than as a small child, and sometimes talks to her about subjects that are not age appropriate for Payton.

Between January and May 2018, Danelle's attendance at visits was very inconsistent. Beasant testified that most of the visits that were missed were due to Danelle not feeling well or an appointment overlapped with her visitation time.

Pursuant to the goal of maintaining safe and stable housing free from illegal substances, Danelle was required to complete urinalysis (UA) testing as requested. Beasant testified that there had been some tests marked as a "no-show" and others marked as a refusal to submit to the test.

Beasant also testified that after January 9, 2018, Danelle was required to do a UA test every day. Beasant testified that the results of the tests Danelle have submitted to have widely varied. On November 2, 2017 and April 10, 2018, she tested positive for methamphetamine. Danelle often tested positive for amphetamines, which was attributed to a prescription medication for Attention Deficit Hyperactivity Disorder (ADHD), but the positive test results were not constant. When asked about it, Danelle told Beasant that she does not have to take her ADHD medication all the time, so it will not show up in every test. Danelle also tested positive at times for alcohol, some of which showed high levels of alcohol. There were also results that showed drugs in the opiate category, which were attributed to prescription pain medication.

Danelle suffered a work-related low-back injury in 2005. Danelle's doctor testified that she is prescribed oxycodone for her pain, and she can take one to two pills every 4 to 6 hours as needed for her pain. She was also prescribed Adderall for ADHD, which was to be taken on a daily basis. Her doctor testified that Danelle should not drink an excessive amount of alcohol with her prescription medication, but was not completely restricted from drinking alcohol. The doctor testified that pain medication and excessive alcohol can make a person tired, dizzy, and off-balance.

Beasant further testified that it was in Payton's best interests to terminate Danelle's parental rights because she has not "addressed substance use, relationship dynamics, or made any substantial changes necessary to facilitate reunification with Payton." She characterized Danelle's progress as fair at times, and poor at other times. She further noted that Danelle had only recently started individual therapy, so there was continued work to be done there, and that Danelle tested positive for methamphetamines about 2 months before trial. Beasant testified that Danelle had not completed any of the goals set forth in the case plans.

Melissa Bauer-Post, a licensed mental health practitioner, also testified. She testified that Payton began individual therapy with her in August 2017. She testified that Payton's behavior at her first few visits indicated that she had been traumatized and was afraid to separate from Claussen, whom she felt safe with. When Payton got more comfortable with Bauer-Post and started to play at the sessions, she showed a lot of aggression in her play. She would pretend to burn Bauer-Post, to shoot her, and to arrest her and put her in jail.

Bauer-Post testified that she started family therapy with Payton and Danelle in February 2018. The family therapy involved helping Danelle keep a bond with Payton, as well as teaching her how to play with Payton and stay engaged while they are together. When they first started family therapy, Danelle would not play with Payton; Payton would go off and play by herself. Bauer-Post testified that at first Danelle was very accepting of feedback from Bauer-Post and would implement her suggestions. However, as the case went on, Danelle would not accept feedback.

Bauer-Post testified that around March 2018, Payton's mood changed and her behavior regressed back to what it was when therapy started. Payton's regression coincided with the time period that Danelle was being inconsistent with her visitation. Danelle's visits were subsequently reduced to once per week, along with one family therapy session per week, and Payton had a complete turnaround. After visits were reduced, which Bauer-Post testified in support of, Danelle stopped taking feedback from Bauer-Post.

Bauer-Post testified that Payton is always happy to see Danelle at visits. Payton runs up to her, gives her a hug, and leads her to whatever she wants to play with at family therapy. However, Bauer-Post also testified that Payton is always ready to leave by the end of the visit. She testified that Danelle has recently been engaged in playing with Payton, but is critical of the way Payton does things, always questioning her and suggesting other ways to do things.

Bauer-Post testified that she does not believe Danelle is taking this juvenile case seriously and that Danelle thinks she can keep doing what she is doing and sooner or later Payton will be returned to her. Bauer-Post testified that there has been only slight progress between Payton and Danelle in family therapy, but that Payton has made great progress in individual therapy. She testified Danelle's attitude concerns her in that she acts like she knows everything and that the professionals do not know anything and cannot help her.

On July 23, 2018, the court entered an order finding that the State had proven § 43-292(2), (4), and (6) by clear and convincing evidence insofar as Danelle was concerned, and that termination of her parental rights was in Payton's best interests. The court also found that the State had proven § 43-292(1), (2), and (6) by clear and convincing evidence insofar as Orrey was concerned, and that termination of his parental rights was in Payton's best interests.

## ASSIGNMENTS OF ERROR

Danelle assigns that the juvenile court erred in finding that the State established by clear and convincing evidence that one or more of the statutory grounds in § 43-292 had been met, and that termination of her parental rights was in Payton's best interest.

Orrey also assigns that the juvenile court erred in finding that one or more of the statutory grounds in § 43-292 had been met, and that termination of his parental rights was in Payton's best interest.

Cynthia and Dana did not assign any error in their brief.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Joseph C.*, 299 Neb. 848, 910 N.W.2d 773 (2018).

## ANALYSIS

*Termination of Danelle's Parental Rights.*

Danelle first assigns that the State failed to prove that Payton came within the meaning of § 43-292(2), (4), and (6) by clear and convincing evidence. For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests. *In re Interest of Leland B.*, 19 Neb. App. 17, 797 N.W.2d 282 (2011). The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id.*

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

Section 43-292(6) provides for termination of parental rights "[f]ollowing a determination that the juvenile is one as described in subsection (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination." Beasant testified that the goals set for Danelle had not changed throughout the case, and that Danelle had not completed any of the goals.

The evidence shows that Danelle was to attend individual therapy to address the issues that caused Payton's adjudication. Beasant discussed the need to attend individual therapy with Danelle from December 2017 until March 2018, when Danelle finally attended her first session. Between March and June, when trial took place, Danelle had only attended three sessions.

In regard to Danelle's requirement to submit to UA tests, there have been some tests marked "no-show" and others marked as a refusal to submit to the test. She has had two positive tests for methamphetamine, the second one being about 2 months before trial. Her methamphetamine use was one of the reasons that Payton was initially removed from the home. Danelle has also tested positive for other drugs which can be attributed to her pain medication and ADHD. However, based on the inconsistent UA test results, she is not taking her ADHD medication on a daily basis, as prescribed by her doctor. She also tested positive at times for alcohol, a few of which showed high levels of alcohol. Her doctor testified that Danelle was not restricted from drinking alcohol, but should not drink an excessive amount of alcohol while taking her prescribed medication.

Bauer-Post had been working with Danelle and Payton in family therapy since February 2018. Bauer-Post testified that Danelle was accepting of feedback in family therapy at first, but became more resistant later on. She also testified that there has been only slight improvement in family therapy.

At one point, Danelle was having visits 7 days per week, but the visits were scaled back to once a week due to Danelle's inconsistent attendance. Payton's behavior at individual therapy changed around the same time that visits became inconsistent. She reverted back to being timid and fearful, and not wanting to leave Claussen's side. Claussen also testified that Payton regressed from the progress she had made during the time that Danelle was inconsistent in attending visits. She testified that Payton became withdrawn again, had a lot of anxiety, was having more tantrums, and regressed on her potty training. When Danelle's visits were reduced to once a week, Payton made a turnaround and was again making progress in therapy and her behavior in her foster home improved. Claussen testified that Payton functions better when her schedule is consistent and Danelle has not been able to provide consistency.

There was also evidence that Danelle had completed "Circle of Security" parenting course, but had not implemented what she had learned. Further, Danelle did not interact with and play with Payton during visits. Claussen testified that during the months she supervised visits, Payton spent a lot of the visitation time either watching something on her tablet or Danelle's phone, or

- 6 -

watching television. Beasant also testified that she was concerned about Danelle's lack of interaction with Payton resulting in Payton playing alone at visits, as well as Danelle's lack of redirection of Payton, and the nonnutritious foods offered by Danelle. She testified that Danelle's lack of interaction with Payton had not changed during the course of the case. Claussen and Beasant also both testified that Danelle was not able to relate to Payton at a level appropriate for her age, and Bauer-Post testified that she is critical of how Payton does things.

Danelle was also in a relationship with and living with Chris, who had a criminal history of multiple assault charges. When Beasant expressed her concern about Danelle's relationship, Danelle stated that she would have whomever she wants in her home and she did not believe Chris had the criminal record Beasant claimed he had. She did not seem to care or understand why Beasant was concerned, even though there had been reports of domestic violence when she lived with Orrey and one of the case plan goals was to provide a home free from unsafe individuals.

In summary, although Danelle had engaged in some services and complied to some extent with the case plan, we conclude that the State proved by clear and convincing evidence that reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to Payton's adjudication, and we affirm the juvenile court's order under § 43-292(6).

Because the evidence clearly and convincingly demonstrates that § 43-292(6) was met, we need not further specifically address the sufficiency of the evidence under § 43-292(2) and (4). Accordingly, Danelle's assignment of error challenging the statutory grounds for termination is without merit.

Danelle also assigns that the juvenile court erred in finding that termination of her rights was in Payton's best interests. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests' analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

We conclude that the evidence demonstrates that Danelle is unfit and that termination of her parental rights is in Payton's best interests. Payton has been in foster care since May 1, 2017, which was over 13 months at the time of trial. In that time period, Danelle has made little progress in her parenting skills and has not achieved the case plan goals which have remained the same. She had only recently started individual therapy, had not been accepting of feedback in family therapy, and continually failed to interact with Payton at visits. Although Beasant testified that Payton was always excited to see Danelle at the beginning of the visit, she was always ready to leave with Claussen by the end of the visit. Danelle also fails to see why Beasant was concerned about the relationship between Danelle and Chris, who had a history of assault.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014). Children cannot, and should not, be suspended in

foster care or be made to await uncertain parental maturity. *Id.* Based on the evidence, Danelle is either unable or unwilling to rehabilitate herself. She was provided with numerous services to help her regain custody of Payton without success. Payton had been in foster care for over 13 months at the time of trial and deserves permanency.

For the foregoing reasons, we find the juvenile court did not err in determining there was clear and convincing evidence that termination of Danelle's parental rights was in Payton's best interests.

*Termination of Orrey's Parental Rights.*

Before addressing Orrey's assignments of error, we first must discuss the chronology of the appeal in this case. Danelle filed her notice of appeal on July 25, 2018. Orrey filed a notice of appeal on August 8, 2018. In response to Orrey's notice of appeal, the clerk of the Nebraska Supreme Court sent a letter to the Scotts Bluff County Court and copied all attorneys of record, advising them that pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2010), multiple appeals from the same case could not be docketed. The clerk advised, "Therefore, the notice of appeal filed by [Orrey] shall be treated as a second notice of appeal in the above-captioned matter." This is in accord with § 2-101(C), which states:

> Method of Docketing Case; Multiple Appeals from Same Case Prohibited. Upon receipt of the material required by § 2-101(B), the Clerk of the Supreme Court shall thereupon docket the case designating the party or parties first having filed the notice of appeal in the district court as appellant or appellants. All other parties shall be designated as appellees, and any attempt to appeal thereafter made by any party to the action shall be filed in the existing case and not separately docketed.

Danelle filed a "Brief of Appellant" on December 3, 2018. Orrey filed a brief on January 22, 2019, identifying himself as "Father/Appellant," rather than an appellee. Cynthia and Dana filed a "Brief of Appellees/Intervenors" on February 1, 2019. No further briefing occurred.

In Orrey's brief, he assigned error and sought affirmative relief, but there is no designation of a cross-appeal on the cover of his brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012), which states in full:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. The division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Supreme Court declined to consider a father's arguments appealing the termination of his parental rights, because he failed to properly designate his arguments as a cross-appeal. The father filed a notice of appeal after the mother did so, making him an appellee. The father set forth assignments of error in his brief, which he simply titled "'Brief of Appellee.'" *In re Interest of Natasha H. & Sierra H.*, 258 Neb. at 144, 602 N.W.2d at 450. In its refusal to consider the father's assignments of error,

- 8 -

the court explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," *id.* at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained," *In re Interest of Natasha H. & Sierra H.*, 258 Neb. at 145, 602 N.W.2d at 450. The court further cautioned parties seeking affirmative review of their claims to be aware of the rules governing appeals, noting that "[a]ny party who fails to properly identify and present its claim does so at its peril." *Id.* at 147, 602 N.W.2d at 451. See, also, *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013).

In the present case, after Orrey filed his notice of appeal, the appellate clerk notified him that his notice of appeal would be treated as a second notice of appeal and referred him to § 2-101(C). This rule advised Orrey that he would be designated as an appellee, yet he designated himself as an appellant on his brief. In addition, Orrey failed to comply with the proper filing of a cross-appeal. Section 2-101(E) instructs an appellee on how to assert a cross-appeal, stating: "Cross-Appeal. The proper filing of an appeal shall vest in an appellee the right to cross-appeal against any other party to the appeal. The cross-appeal need only be asserted in the appellee's brief as provided by § 2-109(D)(4)." Based upon our court rules, Orrey, as an appellee, was required to identify his brief as a cross-appeal on the cover and in a separate section in compliance with § 2-109(D)(4). As in *In re Interest of Natasha H. & Sierra H., supra*, and *In re Interest of Chloe P., supra*, we decline to waive the rules on Orrey's behalf and to award him affirmative relief. Accordingly, we do not consider his assignments of error in his attempted cross-appeal and we affirm the juvenile court's termination of his parental rights to Payton.

*Cynthia and Dana's Appeal.*

Cynthia and Dana also filed a notice of appeal after Danelle's and Orrey's notices of appeal, and subsequently filed a brief, challenging the termination of Danelle's parental rights. However, Cynthia and Dana lack standing to appeal the juvenile court's order. Standing involves a real interest in the cause of action, meaning some legal or equitable right, title, or interest in the subject matter of the controversy. *In re Interest of Joseph C.*, 299 Neb. 848, 910 N.W.2d 773 (2018). Under the doctrine of standing, a court may decline to determine merits of a legal claim because the party advancing it is not properly situated to be entitled to its judicial determination. *Id.* Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court. *Id.*

The right of appeal in a juvenile case in this state is purely statutory, and neither foster parents nor grandparents, as such, have a statutory right to appeal from a juvenile court order. *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016). The statute that confers a right to appeal provides, in relevant part, that an appeal from a final order or judgment entered by a juvenile court may be taken by the "juvenile's parent, custodian, or guardian." See Neb. Rev. Stat. § 43-2,106.01(c) (Reissue 2016). The grandparents are not and were not Payton's custodians or guardians for the purposes of the statute. Therefore, Cynthia and Dana lack standing and their appeal is dismissed.

CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Danelle's parental rights existed under § 43-292(6) and that termination was in Payton's best interests. Because Orrey did not properly designate his brief as a cross-appeal, we do not address his assigned error. We therefore affirm the termination of Danelle's and Orrey's parental rights to Payton. Further, because Cynthia and Dana lack standing, their appeal is dismissed.

AFFIRMED.