Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/16/2016 09:08 AM CDT

In re Interest of Alec S., a child
under 18 years of age.
State of Nebraska, appellee, v.
Brenda G., appellant.

___ N.W.2d ___

Filed September 16, 2016.    No. S-15-658.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Parental Rights: Proof.** In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2014) exists and that the termination is in the child's best interests.
3. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.
4. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.
5. **Parental Rights.** The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other.
6. ____. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights.
7. ____. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

Petition for further review from the Court of Appeals, Irwin, Pirtle, and Riedmann, Judges, on appeal thereto from the Separate Juvenile Court of Douglas County, Christopher Kelly, Judge. Judgment of Court of Appeals reversed, and cause remanded with direction.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony Hernandez, and Jocelyn Brasher, Senior Certified Law Student, for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Cassel, J.

## INTRODUCTION

The juvenile court terminated a mother's parental rights to her child. Relying upon our decision in *In re Interest of Aaron D.*,[1] the Nebraska Court of Appeals reversed, concluding that the State failed to prove termination was in the child's best interests.[2] We granted the State's petition for further review. In comparison to the meager record in *In re Interest of Aaron D.*, the record here abounds with clear and convincing evidence supporting the termination. We reverse the Court of Appeals' decision and remand the cause with direction.

## BACKGROUND

### Procedural Background

On September 13, 2013, the State moved for temporary custody of Alec S. According to an affidavit for Alec's removal from the home of his mother, Brenda G., a hotline

---

[1] *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

[2] *In re Interest of Alec S.*, 23 Neb. App. 792, 876 N.W.2d 395 (2016).

of the Department of Health and Human Services (DHHS) received an intake on September 11, alleging that Brenda was diagnosed with mental health issues to the point that she needed to be admitted to a hospital for care. Brenda agreed to a September 12 enrollment in an inpatient program recommended by a Dr. Patera. A DHHS employee learned from Patera's nurse that Patera believed that Brenda needed to be in an inpatient program due to her mental health needs, that Brenda was currently unable to provide care for Alec, and that Brenda did not follow up on her health appointments with health care professionals. The DHHS employee confirmed on September 13 that Brenda had not checked herself into the inpatient program.

The State filed a petition seeking to adjudicate Alec simultaneously with the filing of the motion for temporary custody. The State alleged that Alec, who was "under eight years of age," was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of Brenda. The petition alleged that Brenda had been diagnosed with posttraumatic stress disorder, depression, and anxiety; that she was unable to provide proper care for Alec; that medical professionals had recommended inpatient care; and that Brenda had failed to check herself into the inpatient program as recommended by Patera. An amended petition added that Brenda's use of alcohol and/or controlled substances placed Alec at risk for harm. The juvenile court adjudicated Alec in January 2014.

On March 18, 2014, the juvenile court entered a disposition and permanency planning order. The permanency objective was reunification with a concurrent objective of adoption. The court ordered Brenda to participate in an outpatient chemical dependency therapy program, to continue submitting to random drug and alcohol testing, and to continue participation in programs at "Community Alliance." (According to testimony in the bill of exceptions, Community Alliance provides outpatient chemical dependency treatment.)

The court further ordered her to attend family and individual therapy and to continue participating in psychiatric care. Brenda was allowed supervised visitation with Alec. On September 16, the court entered a review and permanency planning order. It did not order Brenda to participate in a chemical dependency therapy program, but otherwise ordered her to participate in the same tasks as those in the March 18 order. Substantially the same requirements were contained in a January 20, 2015, order.

On February 6, 2015, the State filed a motion to terminate Brenda's parental rights under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2014).

TERMINATION HEARING

In June 2015, the juvenile court conducted a termination hearing. Four witnesses—all called on behalf of the State—testified.

Dr. Randy LaGrone, a clinical psychologist, testified about Brenda's participation in outpatient psychological care beginning in January 2013. Her primary diagnosis was posttraumatic stress disorder, and LaGrone began working with her to obtain consistency in treatment and to increase her sense of safety. He met with Brenda only six times—Brenda missed or canceled 19 sessions. Because Brenda's difficulties were very treatable at that time and LaGrone wanted her to see someone, he made referrals to other community agencies. But Brenda did not act on those referrals. According to LaGrone, Brenda did not make any progress toward her goals. He discharged her in August 2014.

Mary Atwood, Alec's mental health therapist, provided testimony about therapy. Alec was diagnosed with "[a]djustment disorder with mixed emotions," and a treatment plan was created to work with his emotions. Atwood had two sessions of individual therapy with Alec. In March 2014, a case manager requested that Atwood conduct family therapy with Alec and Brenda. Despite scheduling weekly appointments, Atwood

had conducted only three sessions of family therapy over 2 months. According to Atwood, Brenda did not demonstrate any insight regarding the need for family therapy. The goal was to start communication between Alec and Brenda, because Alec did not feel like he could speak honestly with his mother. Atwood testified that because Brenda spent the time "fussing" over Alec and asking him questions, no progress was made toward the goal. Atwood added that as a result of Brenda's questioning, Alec tended to "shut down."

Jennifer Ratliff, a mental health therapist, testified about her individual therapy with Alec. She diagnosed Alec with adjustment disorder, unspecified, and also identified features of attention deficit hyperactivity disorder. Due to those features, Alec needed a moderately structured and stable environment to help manage the symptoms that accompanied the diagnosis. Ratliff elaborated:

> [H]e needs an environment where his physical needs are met consistently, as well as emotional needs, and any ongoing mental health services or needs need to be provided to him, including psychiatric care for medication management. Also he needs to be in an environment where . . . there are consistent rules and nonphysical discipline.

Alec made progress in two areas: identifying activities to engage in to serve as coping skills and expressing emotions. But due to becoming withdrawn, he did not make progress in addressing past trauma.

Ratliff began conducting family therapy with Alec and Brenda in March 2015. Its goals were to establish and improve communication, especially identifying and expressing emotions. Brenda attended four of the eight scheduled appointments: two in March and two in May. According to Ratliff, no progress was made during the first couple of sessions, because Brenda appeared to be preoccupied with Alec's hygiene. And Ratliff testified that Alec became withdrawn when Brenda discussed her involvement with DHHS in Alec's presence.

But the two sessions in May went well, with Brenda engaging in therapeutic dialog with Alec. Ratliff testified that Alec and Brenda were bonded and that it would be best for Alec to maintain contact with Brenda, even if her parental rights were terminated.

Finally, Alyssa Gill, a family permanency specialist with DHHS, testified. Gill was officially assigned the family's case in February 2015. She then reviewed the prior caseworkers' documented interactions with Brenda. Gill testified about Brenda's lack of compliance with various aspects of court-ordered services. There was no documentation that Brenda had completed individual therapy. To Gill's knowledge, Brenda had not completed any chemical dependency treatment. Brenda had not fully complied with urinalysis testing, and Gill testified that some of the tests in April and May 2015 were positive for alcohol.

Visitation never progressed beyond being fully supervised. Gill testified that generally, if visitation was still being supervised after a child had been in an out-of-home placement for 12 months, it meant that a safety threat was still present and that "not a lot" of progress was being made to address it. Brenda was given one visit per week, but she had missed a few visits since March 2015.

Gill testified that Brenda's mental health remained a primary concern. Gill communicated with Brenda's psychiatrist and obtained medical records from the time that Brenda was admitted to a psychiatric ward in February 2015 to the time of the termination hearing. Upon Gill's inquiry, Brenda told her that Alec's foster parents "tricked her and made her go" to inpatient treatment. But the documentation Gill received revealed that Brenda had admitted to drinking a pint of vodka and going to a police station. Alec's foster parents were then alerted because they had been "a support" to Brenda. Due to concerns about Brenda's safety after speaking with her, the foster parents took her to the hospital. Brenda's psychiatrist recommended that Brenda remain in treatment, but she left

after 4 days. Gill testified that against medical orders, Brenda left because "[s]he just felt that she did not belong there because she had been tricked to go there."

Obtaining stable housing has been a struggle for Brenda. As of November 2014, Brenda was homeless and staying at various shelters. Gill learned that Brenda had also been staying with a sister after being banned from some of the shelters as a result of her alcohol use, her escalating anger, and her inability to show stability and maintenance of her mental health. At the time of the termination hearing, Brenda was living at the "Salvation Army Mental Health and Community Support Transitional Living." Although this was appropriate housing for Brenda, children were not allowed to reside there.

Gill recognized that in the few months prior to the hearing, Brenda had made progress in certain areas. These included improvements in housing, in supervised visits, and in family therapy sessions. Gill confirmed that visitation workers reported a bond between Alec and Brenda. But Gill feared that Brenda would not maintain services if Alec were returned to Brenda's care. Gill testified that she took into consideration her conversations with Alec in forming her opinion as to what was in Alec's best interests, and she recommended termination of Brenda's parental rights.

The court received a number of exhibits during the hearing. Visitation notes for October 2013 stated that Brenda freely provided Alec with affection throughout all of the visits and that she was swift to appropriately redirect Alec's behavior using verbal warnings. However, Brenda was quick to get angry and would yell during visits. She was also late to every visit. Notes for April 2014 stated that Brenda was loving toward Alec and that he was affectionate in return. In May, a visitation specialist stated that Brenda seemed edgy and distracted. According to the document, the specialist had been told that Brenda had tested positive for methamphetamine a few weeks prior and that since the positive test, she had not

been submitting to testing. Notes for visitations in June stated that Brenda had "made a clear effort this month to not only show up to her visit but showing up on time too" and seemed "to be in a better head space." In July, the visitation specialist recommended more visitation days.

### Juvenile Court's Decision

The juvenile court terminated Brenda's parental rights. The court found that Brenda's participation in visitation with Alec was sporadic and that she had not participated with therapeutic services to the degree needed to move the case toward reunification. The court recognized that there was a bond between Alec and Brenda and that Brenda's "performance in certain areas has improved somewhat over the past four months, following the filing of the Motion for Termination of Parental Rights." But the court noted that Alec had been in an out-of-home placement for 21 months and stated that there was "no realistic possibility of reunification . . . in the near, or even relatively distant future, given [Brenda's] ongoing issues with respect to substance abuse, mental health considerations and her failure to meaningfully and consistently participate with services so as to achieve reunification." The court found by clear and convincing evidence that the State proved grounds for termination under § 43-292(2), (6), and (7) and that termination was in Alec's best interests.

### Court of Appeals' Decision

Upon Brenda's appeal, the Court of Appeals determined that the record clearly and convincingly showed that a ground for termination under § 43-292(7) existed. Thus, the court did not review whether termination was proper under § 43-292(2) or (6). The court found the evidence to be similar to that presented in *In re Interest of Aaron D.*[3] Ultimately, the Court of

---

[3] *In re Interest of Aaron D., supra* note 1.

Appeals determined that the State failed to adduce clear and convincing evidence that terminating Brenda's parental rights was in Alec's best interests.[4]

We granted the State's petition for further review.

## ASSIGNMENT OF ERROR

The State assigns that the Court of Appeals erred in determining that the State failed to adduce clear and convincing evidence that termination of Brenda's parental rights was in Alec's best interests.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[5]

## ANALYSIS

[2] In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests.[6] The juvenile court found the State established by clear and convincing evidence that termination was in Alec's best interests, but the Court of Appeals disagreed.

The Court of Appeals found the evidence to be similar to that in *In re Interest of Aaron D.* But we find that case to be distinguishable in several respects.

First, in *In re Interest of Aaron D.*, the State sought to terminate the mother's parental rights on the sole ground that the child had been in out-of-home placement for 15 or more of the most recent 22 months.[7] With regard to termination in cases based solely on § 43-292(7), we stated that termination

---

[4] See *In re Interest of Alec S., supra* note 2.

[5] *In re Interest of Alan L., ante* p. 261, 882 N.W.2d 682 (2016).

[6] *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

[7] See § 43-292(7).

may prove difficult . . . where the record is insufficient to prove any of the other statutory grounds—i.e., where the parent did not abandon the child, did not neglect to protect or provide for a child, was not unfit or unable to parent, did not fail to participate in necessary rehabilitation, and was not abusive.[8]

That is not true here. In addition to the subsection (7) finding, the juvenile court found sufficient evidence for termination on the bases that Brenda substantially and continuously or repeatedly neglected and refused to give Alec necessary parental care and protection and that reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication.[9]

Second, the record in *In re Interest of Aaron D.* did not contain any dispositional orders setting forth the court-ordered rehabilitation plans. We observed that "the State failed to introduce that evidence in support of its contention that [the mother] failed to meet the requirements of her rehabilitative plan, and is relying on [the mother's] alleged failure to comply with requirements that are not fully evidenced by the record."[10] And we elaborated on the consequence of this failure:

[B]ecause no court-ordered plan is part of our record, the reasonability of the requirements imposed on [the mother] is uncertain. Under those circumstances, we cannot find [the mother's] alleged noncompliance with the requirements of her rehabilitation plan to be clear and convincing evidence that termination of her parental rights is in [the child's] best interests.[11]

---

[8] *In re Interest of Aaron D., supra* note 1, 269 Neb. at 261, 691 N.W.2d at 173.

[9] See § 43-292(2) and (6).

[10] *In re Interest of Aaron D., supra* note 1, 269 Neb. at 264, 691 N.W.2d at 175.

[11] *Id.* at 264, 691 N.W.2d at 176.

Here, in contrast, the record contains numerous orders. These include a disposition and permanency planning order from March 18, 2014; a review and permanency planning order from September 16; and a review, permanency planning, and "LB-1041 Finding" order from January 20, 2015. These orders directed Brenda to participate in such things as urinalysis testing, programs at Community Alliance, individual and family therapy, psychiatric care, and supervised visitation. The requirements imposed on Brenda mesh with her faults as identified in the adjudication petition.

Third, the number of witnesses testifying on each party's behalf differs. In *In re Interest of Aaron D.*, only one witness testified for the State, while at least three witnesses—the mother, the child, and a family therapist—testified for the mother. Here, the State presented the testimony of four witnesses; no one testified on Brenda's behalf.

In *In re Interest of Aaron D.*, the lack of other witnesses for the State was particularly problematic. It used a DHHS caseworker "as a proxy for all of the other witnesses whose expertise and testimony would have been helpful . . . in determining what was in [the child's] best interests."[12] The caseworker's testimony was largely based on her review of records generated by those who directly observed the mother and child. Thus, much of the caseworker's testimony was based on hearsay. And in some instances, that hearsay evidence was contradicted by the testimony of the mother's witnesses.

The situation here differs in two respects. Although Gill provided testimony based on her review of records and reports generated by others, the record shows that she did more than merely review documentation in the case file. She spoke with Brenda in person and over the telephone, and she also communicated with various individuals providing services to Brenda.

---

[12] *Id.* at 261, 691 N.W.2d at 174.

And Gill's testimony was generally uncontradicted. But more importantly, the State adduced testimony from others who directly worked with Alec and Brenda. This is in sharp contrast to *In re Interest of Aaron D.*, where much of the State's evidence was based on hearsay. The court in that case observed that the child's therapists did not testify. Here, two of Alec's therapists testified.

Certainly, the State could have called more witnesses and produced more evidence. In *In re Interest of Aaron D.*, like in this case, no testimony was adduced from the child's foster parents, teachers, or visitation supervisors. The Court of Appeals noted several deficiencies in the record: It contained no evidence from Patera as to Brenda's need for inpatient treatment, no evidence "as to how Brenda's mental health diagnoses and treatment needs affected her ability to safely parent Alec,"[13] little evidence "regarding what is continually and vaguely referred to as Brenda's 'mental health needs' upon which the removal and adjudication were primarily based,"[14] and no evidence as to why Brenda was required to undergo random testing for alcohol or drugs. However, the record contains Brenda's mental health diagnoses and refers to issues she had with alcohol and controlled substances. While filling in these gaps could have aided appellate review, the lack of all the "gory details" does not mean the State failed to meet its burden of proof.

[3-5] The overriding legal framework is well settled. A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.[15] In the context of the constitutionally protected relationship

---

[13] *In re Interest of Alec S., supra* note 2, 23 Neb. App. at 801, 876 N.W.2d at 402.

[14] *Id.*

[15] *In re Interest of Isabel P. et al., supra* note 6.

between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.[16] The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other.[17]

[6] The evidence demonstrates that Brenda is unfit and that termination of her parental rights is in Alec's best interests. There is no dispute that Brenda has mental health issues, but she has failed to consistently attend treatment for the problem. Ratliff testified that structure was vital and necessary to improve the symptoms of Alec's attention deficit hyperactivity disorder, but there was no evidence that Brenda was capable of providing stability for Alec. Even more problematic is that 17 months after the case began, Brenda still lacked an understanding of why Alec was unsafe or why she needed to engage in the services offered to show that she could provide for Alec. She had sufficient opportunity to comply with the reunification plan within the 15-month condition contained in § 43-292(7), which "'serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves.'"[18] But she failed to do so. We recognize that Brenda had made some progress toward her goals, but her actions appear to have been prompted by the filing of the motion to terminate her rights. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights.[19]

---

[16] *Id.*

[17] See *id.*

[18] *In re Interest of Aaron D., supra* note 1, 269 Neb. at 261, 691 N.W.2d at 173.

[19] *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999).

Two witnesses specifically testified as to Alec's best interests. Gill opined that termination of Brenda's parental rights was in Alec's best interests. She based her opinion on the duration of the case, Alec's remaining in an out-of-home placement, the lack of liberalized visitation, Brenda's erratic behavior, and the lack of compliance with court orders. As Gill summarized, "[W]e're still very much where we were at when this case first opened." Ratliff, on the other hand, testified:

> Because there is an established bond and attachment between Alec and [Brenda], my recommendation is that the relationship continue. How that is to be done, I don't have a firm recommendation.
>
> I have offered to the [foster parents] and to [Brenda] that I would facilitate a family therapy session with the adults only, and we could come up with a plan to maintain that relationship. I believe that it would be detrimental to Alec's well-being if that relationship was severed.

But Brenda's having a bond with Alec does not make her a fit person to provide parental care for him. And although Ratliff testified that it was in Alec's best interests to "maintain a relationship with" Brenda, there was no indication from her testimony that the relationship needed to be a mother-son relationship.

[7] Alec deserves permanency. Brenda's failure to comply with the court-ordered rehabilitation plan defeated his chance to be reunified with her. At the time of the hearing, Alec had been in the State's care for 21 months. During that time, Brenda had not even progressed to being allowed unsupervised visitation with Alec. Because much progress must still be made before Brenda would be trusted with Alec's care and custody, Alec would be left to languish in foster care for an unknown amount of time with no guarantee of reunification. Children cannot, and should not, be suspended in foster care

or be made to await uncertain parental maturity.[20] We conclude that the State showed by clear and convincing evidence that termination of Brenda's parental rights was in Alec's best interests.

## CONCLUSION

Upon our de novo review of the record, we conclude that the State adduced clear and convincing evidence that termination was in Alec's best interests. We reverse the decision of the Court of Appeals and remand the cause with direction to affirm the judgment of the juvenile court.

Reversed and remanded with direction.

---

[20] *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).