IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF URIEL D. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF URIEL D. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TYRONE D., APPELLANT, AND ALEXANDRIA D., APPELLEE.


Filed March 25, 2025.    No. A-24-605.


Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Affirmed.

Kenneth F. Jacobs, of Hug and Jacobs, L.L.C., and Tasia Matsuda, Senior Certified Law Student, for appellant.

Cara Stirts, Deputy Douglas County Attorney, for appellee State of Nebraska.

Thomas C. Riley, Douglas County Public Defender, and Nicole J. Tegtmeier for appellee, Alexandria D.


MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Tyrone D. and Alexandria D. have four children together. After being involved with the Nebraska Department of Health and Human Services (DHHS) for multiple years, the separate juvenile court of Douglas County determined that it was in the children's best interests for Tyrone and Alexandria to lose their parental rights. Tyrone and Alexandria now separately appeal the termination of their parental rights. For the reasons that follow, we affirm.

## II. BACKGROUND

Tyrone and Alexandria have four children, Uriel, born in 2011; Tiana, born in 2013; Javion, born in 2014; and Journee, born in 2018.

Tyrone and Alexandria's involvement with DHHS began in 2013 when an intake was received that alleged Tyrone was physically abusing then 2-year-old Uriel and 4-month-old Tiana. The intake, which was later substantiated by DHHS, indicated that Uriel had multiple bruises on his body and that Tiana's bottom was red from being spanked. Additionally, the intake reported the home was very unsanitary with trash strewn all over. Several more intakes were received by DHHS in 2014, 2015, 2016, 2018, 2019, and 2020. These intakes generally alleged that Tyrone continued to physically abuse his children and domestically assault Alexandria. Further, several of these intakes alleged the children were being neglected by both parents and that the home was covered in trash and feces. These intakes were eventually determined to be either unfounded or screened out as not meeting the definition of neglect or abuse.

At some point around June 2019 the children began living with their paternal grandparents. During this time, the children displayed severe behavioral issues. Notably, the last intake from July 2020 alleged that Uriel and Tiana had engaged in sexual activity. While it appears that these allegations were not disputed, the intake was screened out as not meeting the definition of sexual abuse.

On December 16, 2020, a petition was filed in the separate juvenile court of Lancaster County that alleged Tyrone and Alexandria's children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024). This petition alleged that Uriel, Tiana, Javion, and Journee lacked proper parental care because Tyrone and Alexandria had both received offers of assistance from DHHS since February 2020, had failed to provide a stable and safe living environment for their children, and failed to provide for their children's needs. The petition also alleged the children had resided outside of their parental homes from June 2019 to December 2020 and that their current placement was no longer willing to provide for them. Due to these reasons, the petition alleged the four children were at a risk of harm.

Also on December 16, 2020, the State filed a motion for an ex parte order for emergency temporary custody. This motion was granted and the children were placed in the temporary custody of DHHS. On December 23, a protective custody hearing was held and the court found it was in the best interests of the children to remain in the temporary care of DHHS. An adjudication hearing was held on January 25, 2021, and Tyrone and Alexandria both "answered no contest to the allegations."

On March 19, 2021, the matter was transferred to the separate juvenile court of Douglas County. As part of the transfer order, Tyrone and Alexandria were both ordered to complete a co-occurring evaluation, a parenting assessment, and a parenting class. They were also ordered to participate in supervised visitations, family support services, and instructed to maintain safe and stable homes. Lastly, they were ordered to not use physical discipline on the children and Tyrone was ordered to not engage in intimidating or controlling behaviors.

On May 10, 2021, a disposition hearing was held and the court ordered the children to remain in DHHS custody. In addition to the prior requirements, the court also ordered Alexandria to participate in family therapy, participate in individual therapy, and maintain a stable source of

income. Similarly, Tyrone was ordered to participate in family therapy, maintain a stable and legal source of income, not possess or ingest alcohol or any other controlled substance, and submit to random urinalysis testing.

Over the next 2 years, the children exhibited numerous behavioral problems. Uriel continued to display aggressive, violent, and sexualized behaviors that required him to live separately from his siblings. Tiana and Javion also exhibited aggressive and sexualized behaviors, but to lesser extents. And although Tyrone and Alexandria had complied with most of their court ordered requirements and had participated in supervised visitations, they failed to demonstrate sustained progress. More specifically, after multiple years, neither parent had advanced to more lenient visitations and they both still struggled with managing their children's behaviors.

As a result, on August 3, 2023, the State filed separate motions requesting the termination of Tyrone and Alexandria's parental rights. These motions alleged that the children were within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination of Tyrone and Alexandria's parental rights were in the children's best interests.

The termination hearing was held on May 1 and 2, 2024. The State presented testimony from eight witnesses, including the children's foster parents, visitation supervisors, family support workers, therapists, and case manager. Alexandria then testified on her own behalf.

Judy White is a foster parent who received specialized training to foster children with higher needs. White has been Uriel's foster parent since July 2022. Throughout this time, she has experienced Uriel's multiple behavioral problems. She described how Uriel threatens, screams at, and acts aggressively toward others. He also tears things up and often refuses to listen. Despite having a more stable living environment, White said that Uriel's behaviors have progressively worsened as he got older.

White explained that in the time Uriel has lived with her, she has not had much interaction with Tyrone or Alexandria. She stated that they do not reach out to her, attend Uriel's appointments, and except for one time by Tyrone, participate in his school meetings. This meant that the only time Uriel saw his parents was during their separate weekly visitations, which had recently ceased. White expressed concern about the effects these visitations had on Uriel because he often returned upset due to confrontations he had with his parents or siblings. These confrontations were sometimes severe enough that the next visit was preemptively canceled.

Patricia Todd has been Tiana, Javion, and Journee's foster parent since January 24, 2022. She discussed each child's history of violence and aggression and stated that they all attend therapy to deal with their issues. Todd stated that when they first lived with her, Tiana and Javion used to fight one another, rip doors off their hinges, and punch holes in the walls. More tragically, she explained that both Tiana and Javion were hospitalized for suicidal thoughts. Tiana was hospitalized twice, once for 5 days in the spring of 2022 and then again for 6 days at some point afterward. Javion was hospitalized for 5 days in the summer of 2023 after he was found rocking back and forth saying he wanted to kill himself. White also talked about Journee's behaviors and how she used to have daily outbursts at daycare and act out against other children.

Todd expressed that Tiana, Javion, and Journee's behaviors had improved since living with her. She stated that Tiana and Javion no longer act violently toward one another and that the frequency of Journee's outbursts have significantly decreased. Additionally, she spoke about how

Tiana and Javion were released from their therapy programs in the fall of 2023 because they were doing so well. They now attend therapy through a different organization.

Todd also briefly spoke about Uriel, who she provided respite care for on several occasions. Uriel also comes to their house frequently to visit his siblings. Todd discussed how she has thought about fostering Uriel but said his behaviors were too extreme and that he needed more help than she could provide. While most of Uriel's visits to their home were uneventful, Todd discussed an incident where he threw a chair, pushed her son over a bench, and started getting violent because he did not want to leave. Uriel also told her and her husband that they were "white devils who take black babies."

Todd then discussed Tyrone and Alexandria's visitation schedules. She said that Alexandria communicates with her frequently, but Tyrone does not. However, despite this communication, Alexandria failed to regularly attend her visitations and only attended around 50 percent of the scheduled visits. But when she attended the visits, the children often refused to listen to her and were rowdier than normal. Todd said that although Tyrone was more consistent with his visitations, his visitations impacted the children's behaviors. She discussed how the children got more anxious before Tyrone's visits, were more disruptive after them, and believed they could do whatever they wanted at his house. She also spoke about an incident where she believed Tyrone was telling the children to keep secrets and was pressuring them to say that they wanted to live with him.

Gilberto Rodriguez is a visitation supervisor who has supervised Alexandria's visitations since August 2023. He stated that Alexandria attended approximately 50 to 70 percent of her visitations. However, he noted that the missed visits were often due to her not having transportation, not feeling well, or due to him not being able to provide supervision services that week.

Rodriguez testified that most of the visits were chaotic because the children refused to listen to Alexandria. Due to her inability to control the kids, she would get overwhelmed and start yelling profanities at the children. There were two occasions where the visit had to be stopped early due to the children's behaviors. The most recent incident occurred only a week before the hearing and involved Uriel and Alexandria arguing at the mall. Uriel was yelling at her and continued to act aggressively until other people were able to calm him down.

Kaylee Bergers is a family support worker who has supervised Tyrone's visitations since July 2023. She said that Tyrone has only canceled five visits and two of those were due to medical issues. She explained that Tyrone's initial goals were to provide better structure and consistency and learn how to impose appropriate discipline for the children. She stated that Tyrone generally took her advice during visits but struggled with implementing the changes long term. She then discussed safety concerns she had regarding the children's behaviors. These concerns involved Journee opening the car door while being transported, Uriel flirting with Bergers' co-worker, and sexualized behaviors between Tiana and Javion. She specified that these behaviors were not Tyrone's fault because they occurred outside of his visitations. Nevertheless, Tyrone's visitations were stopped in April 2024 after the visitation agency refused to provide services due to these concerns.

Bergers also discussed an incident that occurred in November 2023. She said that Tyrone and Uriel were arguing so Tiana went to go hide in a closet. While she was in the closet, Journee

tried to slam the closet door shut. After this, Tiana punched Journee in the jaw which upset Tyrone. Tyrone then yelled at Tiana while towering over her which incited Bergers to call the police. Uriel became upset about the police being called and "made moves" to hit Bergers. However, Tyrone was able to step in between them and de-escalate the situation.

Wesley Hickman is a family support worker who worked with Tyrone from February to April 2024. He assisted Tyrone with implementing a budget, receiving services, becoming financially secure, and obtaining housing. He also supervised several individual visits between Tyrone and Uriel. He discussed how during the visits they worked on age-appropriate discipline and activities. He stated that Tyrone made progress on his goals by remaining employed and successfully making a budget but struggled with obtaining housing because of a plumbing or electrical problem at his residence that resulted in his lease being terminated. The only barriers Hickman identified were Tyrone's difficulty in managing his children's behaviors and planning activities. He also noted that Uriel often brought up non-age-appropriate topics during their visitations. Hickman stopped providing services in April 2024 after an unspecified incident with Uriel led to his agency not continuing services.

Brianna Vitera was Uriel's therapist from January 2022 until February 2024. She diagnosed him with ADHD, combined type, and intermittent explosive disorder. She stated that due to Uriel's behavioral issues, his primary goals involved him understanding his anger and becoming more engaged with his academics. Over the 2 years she worked with him, Vitera said that Uriel made minimal progress. She stopped working with him in February 2024 because he started to make inappropriate comments, ask about intimate details of her life, and had an outburst during their last session. Due to these problems, she believed that he would do better with a male therapist. But overall, she stated that Uriel needed consistency, clear expectations, and a lot of nurturing to make progress on his goals.

Erika Robinson is a therapist who specializes in treating trauma. She worked with Tiana and Javion from March 2022 until October 2023, and Journee from August 2022 until October 2023. She also provided child/parent psychotherapy for Tyrone and the children for a brief period in June 2023. She terminated this child/parent psychotherapy after only a few sessions because the children were not engaging with the treatment. She noted that the children were yelling, running around, and constantly leaving the room which led to a lot of distress in their interactions.

Robinson diagnosed Tiana with other reactions to stress, child neglect, confirmed counter, and child affected by parental distress. When she started to work with her, Tiana was exhibiting aggression toward her siblings and foster parents. Due to this, her primary goals were to decrease the frequency of those behaviors and reduce her trauma response. Robinson testified that Tiana made progress on these goals by implementing coping mechanisms that reduced her aggressive behaviors. Robinson said that she stopped working with Tiana because she successfully achieved her treatment goals.

Robinson diagnosed Javion with generalized anxiety disorder, major depressive disorder, single episode, unspecified, ADHD, combined presentation, child neglect, confirmed, initial encounter, and child affected by parental relationship distress. His treatment plan included decreasing the frequency of his violent behaviors, developing coping skills, decreasing his depression symptoms, and decreasing his trauma response. Robinson stated that Javion made progress on these goals. She attributed his progress to the consistency and structure that his current

foster home provided. She stated that such structure was necessary for his continued improvement. Like Tiana, Robinson stopped working with Javion after he successfully achieved his treatment goals.

Robinson diagnosed Journee with other specific trauma and stressor-related disorder, adjustment like disorder with prolonged duration of more than 6 months without prolonged duration of stressor, and child affected by parental relationship distress by collateral report. Her treatment goals were centered around decreasing her aggressive and violent behaviors and decreasing her trauma response. Robinson stated that to achieve her goals, Journee required consistency and stability. She said that throughout the time she worked with her, Journee made minor progress on her goals and was eventually discharged when she switched programs.

Emily Welch works for DHHS as a child and family services specialist. In this role, she has worked as the children's case manager since November 14, 2022.

As it relates to Tyrone, Welch observed that he maintained stable employment, consistently attended his visitations, participated in Uriel's school meetings, and successfully passed enough urinalysis tests to no longer require them. However, she noted that he struggled with obtaining stable housing and made little progress in controlling his children's behaviors. For his housing, Welch did a walk-through of Tyrone's apartment in 2023 and found it to be safe for the children. However, that house experienced a maintenance issue that resulted in Tyrone's lease being canceled. He has since struggled to find housing and now resides with a friend.

Welch also discussed Tyrone's visitations. She stated that although he consistently participated in the supervised visitations and attempted the child/parent psychotherapy, he never progressed toward more lenient visitations. She testified that more lenient visitations were never recommended because Tyrone was unable to manage his children's behaviors. More specifically, she was concerned about reports of him physically intimidating the children and instructing them to act in certain ways. Although there were reports from December 2023 from Tyrone's therapist that he had improved his parenting skills in the last year, Welch classified Tyrone's progress toward reunification as "poor" and believed that terminating his parental rights was in the best interests of his children. She stated that Tyrone had failed to alleviate the conditions that initially led to the children's removal and expressed concern about how little progress he had made in the 3½ years since the children were removed.

For Alexandria, Welch generally testified that her income, housing, and participation in visitations were inconsistent. Although Welch took over the case in November 2022, she was unable to contact Alexandria until February 2023. Further, Alexandria was regularly unable to provide evidence of employment. While she claimed to be employed at a restaurant, and then at Goodwill, she often failed to provide Welch with her paystubs. This concerned Welch because if she was unable to maintain a job, she was would not be able to meet the children's needs. For housing, Welch stated that she was unable to do walk-throughs of Alexandria's previous homes due to a lack of communication. And although she performed a walk-through of Alexandria's current home, Welch received reports from visitation workers that a strange man was living with her. The visitation agencies reported that she refused to have the man leave when asked and claimed that it was her father's home health aide. Further, the agencies reported that this man smoked around the children and possibly used them in TikTok ads to promote his business.

Welch also discussed Alexandria's refusal to abide by court orders and her lack of engagement with services. She described how Alexandria was ordered to participate in individual therapy but failed to do so. She initially told Welch that she was going back to a previous therapist but never took steps to do so. It was only after Welch called that therapist's office that she learned Alexandria was not abiding by the court order. However, it was later revealed that Alexandria could not afford the individual therapy after her Medicaid application was denied and DHHS refused to pay for it. Welch then described how Alexandria was offered family support services but was discharged due to lack of engagement. This concerned Welch because it was another example of Alexandria not utilizing a resource provided to her.

Welch then discussed Alexandria's inconsistency with visitations. Welch explained that because some of this inconsistency was related to transportation issues, she offered Alexandria bus passes and transportation services. However, even with these services, she still struggled to regularly participate in the visitations. Welch testified that she only attended one or two visitations out of the four scheduled each month. This lack of participation concerned Welch because if Alexandria was unable to manage one 2-hour visitation per week, she could not handle the children's schedules full time. Because of her irregular attendance, Alexandria never progressed toward more lenient visitations.

Welch described Alexandria's overall progress toward reunification as poor. She expressed how the case had been open for 3½ years with very little sustained progress. In contrast, the children displayed many positive changes since their removal. Welch explained that when they were removed, the children were essentially "feral" with extreme behaviors and anger. However, those behaviors had largely been mitigated by the stability provided by their foster homes and the services received from DHHS. Due to this, and Alexandria's lack of sustained improvement, Welch believed it was in the children's best interests to terminate her parental rights.

Alexandria then testified. However, her testimony was limited to explaining that she had stable housing throughout the pendency of the case and had abided by the court order to participate in therapy. She stated that she contacted her therapist in February 2023 and notified DHHS of this contact after speaking with Welch about it.

On July 17, 2024, the court issued its order terminating Tyrone and Alexandria's parental rights. This order determined by clear and convincing evidence that the children were within the meaning of § 43-292(2), (6), and (7) and that terminating their parental rights were in their best interests.

## III. ASSIGNMENTS OF ERROR

Restated, Tyrone assigns that the juvenile court erred in its determination that terminating his parental rights was in the best interests of his children.

On cross-appeal, Alexandria assigns that the juvenile court erred in determining that the evidence was sufficient to support the termination of her parental rights and that terminating her rights was in the best interests of her children.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb.

529, 949 N.W.2d 773 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

### 1. STATUTORY GROUNDS UNDER § 43-292

Tyrone and Alexandria both concede that a statutory requirement under § 43-292(7) was met. There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Although Tyrone and Alexandria each concede this point, for the sake of completeness, we conclude that the statutory ground under § 43-292(7) was met for both parents. Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Uriel, Tiana, Javion, and Journee were removed from Tyrone and Alexandria's home in December 2020 and have been in DHHS custody ever since. Accordingly, when the motions to terminate Tyrone and Alexandria's parental rights were filed in August 2023, they had been in an out-of-home placement for 31 months. Therefore, we determine that the State provided clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months as required by § 43-292(7).

### 2. BEST INTERESTS AND UNFITNESS

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable

or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

### (a) Tyrone

Tyrone argues that terminating his parental rights was not in the best interests of his children. Although Tyrone has made improvements in his life, the evidence demonstrates that he is unable to provide his children with the level of parental care they require. Accordingly, we determine the juvenile court did not err in terminating his parental rights.

Since the children were removed, Tyrone regularly remained employed, participated in visitations, passed enough drug tests to no longer require them, attempted child/parent psychotherapy with his children, engaged in therapy, and worked with services to become more financially secure. However, despite these efforts to improve his own life, he has not shown sustained progress in his ability to manage his children's behaviors. Tyrone never progressed past a weekly 2-hour supervised visitation with Uriel, Tiana, Javion, and Journee. And while he had additional individual visitations with Uriel, he still struggled with age-appropriate discipline.

Multiple witnesses discussed Tyrone's lack of progress in properly parenting his children and the impacts this had on them. White expressed that visits with Tyrone caused Uriel to return upset. Todd stated that Tyrone's visits caused the children anxiety and explained how they were more disruptive afterward. Bergers discussed how Tyrone struggled to implement long-term changes. And Welch testified about his minimal overall progress and concerns she had about him continuing to use intimidation tactics against the children. Throughout these testimonies, a common theme emerged that while Tyrone seemed to be improving his own life, he was not making meaningful progress in his parenting skills.

In contrast, most of the children's behaviors have significantly improved since their removal. When they were removed, each child struggled with aggressive and violent behaviors. They were each diagnosed with multiple mental health problems and Tiana and Javion's issues were severe enough to require hospitalization. Since their removal, Tiana and Javion have both completed their therapy goals and reduced their aggressive behaviors. Similarly, the frequency of Journee's outbursts has substantially decreased. And while Uriel's behaviors have not seen much improvement, and may have gotten worse, he now has a more stable and consistent environment to seek treatment.

In our determination, we do not diminish Tyrone's efforts to improve his and his children's lives. He has taken great strides to be involved with his children and develop relationships with them. However, after 3½ years, he has not displayed the requisite parenting skills to properly provide for them. He still struggles to parent his children during a single weekly 2-hour supervised visit. We determine that Tyrone's inability to manage his children's behaviors constitutes a personal deficiency that has prevented and will likely continue to prevent him from performing reasonable parental obligations and that this deficiency has caused and will probably continue to cause detriment to his children's well-being. With this, we determine Tyrone has failed to rehabilitate himself within a reasonable period of time. As such, and because children should not

be suspended in foster care to await uncertain parental maturity, we determine the juvenile court did not err in terminating his parental rights.

### (b) Alexandria

Alexandria argues the evidence was insufficient to support the termination of her parental rights and that terminating her rights was not in the best interests of her children.

Since the children were removed, Alexandria has struggled with maintaining consistent employment, stable housing, and engaging with services. While she claimed to have had a series of jobs, she was regularly unable to provide proof of employment. Similarly, she claimed to have stable housing throughout this period but did not allow her case manager to do walk-throughs for two of her homes. And although she received family support services, she was eventually discharged for lack of engagement.

Beyond these issues, Alexandria also failed to regularly participate in visitations and demonstrate meaningful improvement in her parenting skills. Rodriguez and Todd estimated that she only attended around 50 to 70 percent of her visitations. Welch agreed with this estimate and stated that Alexandria only attended one or two weekly visits a month. While some of these absences were due to Alexandria's transportation or medical issues, many were not. And even when she attended the visits, Rodriguez explained that she struggled with managing the children's behaviors. Rodriguez described how she often got overwhelmed when she was unable to control the children and resorted to yelling profanities at them.

There was also the issue of a strange man living with Alexandria and her reluctance to ask the man to leave during visitations. Welch described how the visitation supervisors told her that this man smoked around the children and used them to advertise for a business on TikTok. While Alexandria claimed this man was her father's home health aide, this was never confirmed.

We determine this evidence was sufficient for the juvenile court to determine that terminating Alexandria's parental rights was in her children's best interests and that the court did not err in terminating her rights. Given Alexandria's issues in maintaining stable employment and housing along with her regular failure to attend visitations and properly parent her children, we determine that she has failed to rehabilitate herself within a reasonable period. Three and a half years after the children were removed, she still displays an inability to manage her own life, let alone the ability to manage the lives of her four children who have severe mental health problems. We determine this inability constitutes a personal deficiency that has prevented and will likely continue to prevent Alexandria from performing her parental obligations and that this deficiency has caused and will probably continue to cause detriment to her children's well-being. Because children should not be suspended in foster care to await uncertain parental maturity, we determine the juvenile court did not err in terminating Alexandria's parental rights.

### VI. CONCLUSION

We conclude the juvenile court did not err in terminating Tyrone and Alexandria's parental rights.

AFFIRMED.