IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DREAM C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DREAM C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALONZO C., APPELLANT.

Filed November 18, 2025.    No. A-25-119.

Appeal from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Lisa F. Lozano for appellant.

Jeremy P. Lavene, Deputy Lancaster County Attorney, for appellee.

PIRTLE, WELCH, and FREEMAN, Judges.

PIRTLE, Judge.

INTRODUCTION

Alonzo C. appeals the order of the separate juvenile court of Lancaster County terminating his parental rights to his minor daughter. Upon our de novo review, we affirm the juvenile court's order.

BACKGROUND

Alonzo is the father of Dream C., born March 2017. Dream's biological mother is deceased.

On March 20, 2023, the State filed a petition to adjudicate Dream as a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State also filed a motion for ex parte order of emergency temporary custody, and on the same day the juvenile court granted the

- 1 -

motion. The Department of Health and Human Services (DHHS) placed Dream with Alonzo's brother.

The State filed an affidavit in support of the emergency protective order, which alleged that in April 2022, Alonzo's former girlfriend, J.S., filed a protection order against him due to domestic violence. However, Alonzo continued to have contact with J.S. In September, DHHS received a report that Alonzo had a domestic disturbance with a different girlfriend who lived with him and Dream in a motel. Dream reported that Alonzo got into fights with his girlfriend, that he choked his girlfriend, and that there was a knife involved.

The affidavit also alleged in February 2023, DHHS assessed Dream's attendance at her elementary school as she had been left at school multiple times by Alonzo since August 2022. Dream had been listed as tardy, truant, or excused 81 times, and Alonzo was cited for neglect. About a week later, a bench warrant was issued for Alonzo for possession of controlled substances, after Alonzo was driving erratically and his vehicle contained a glass pipe that tested positive for methamphetamine. A few days later, J.S.'s children were removed from her care, due to concerns that she was leaving children unsupervised with access to drug paraphernalia. Five days later, J.S. left Dream unattended in a vehicle.

Finally, the affidavit alleged that on March 14, 2023, Alonzo was arrested for violating his protection order against J.S., obstructing a peace officer, and for having five outstanding warrants. In addition to his bench warrant for possession, Alonzo had a previous warrant for violation of a protection order, a warrant for failing to appear in court, and other warrants for stealing money and goods. As Alonzo was transported to jail, he requested that the police leave Dream in the care and custody of J.S., despite having known about the removal of three children from her care.

In May 2023, the State filed a second amended petition. The second amended petition alleged that Dream was a juvenile who lacked proper parental care by reason of the fault or habits of Alonzo. The second amended petition further alleged that Alonzo had failed to provide adequate supervision and care, that Alonzo had displayed violent, aggressive, and/or controlling behavior in the presence of Dream, and that Alonzo had left Dream with an inappropriate caregiver. Dream was subsequently adjudicated to be a juvenile as described in § 43-247(3)(a).

An initial disposition hearing was completed on June 27, 2023, where the juvenile court ordered a detailed rehabilitative plan for Alonzo. Alonzo's rehabilitation plan ordered compliance with (1) having supervised parenting time with Dream, including telephone/video parenting time while incarcerated; (2) attending and successfully completing a men's domestic violence/batterer's program; (3) not engaging in any threatening, controlling, or manipulative behaviors, or physical altercations/aggression with any individual; (4) maintaining a safe and stable living environment for himself and Dream; (5) maintaining employment for legal means of support for himself and Dream; (6) notifying the DHHS case manager of any changes in residence, address, or phone number; (7) maintaining regular contact with DHHS; and (8) reporting law enforcement contact.

In September 2023, these conditions continued with the additional condition that Alonzo participate in individual outpatient therapy as recommended in his evaluation. Alonzo's rehabilitation plan was continued in the review orders from December 2023 and March 2024. Throughout the entirety of the case, Alonzo was made aware that the plan in place needed to be accomplished for reunification.

In December 2023, while incarcerated, Alonzo was found guilty of assault by a confined person. Alonzo was placed in solitary confinement because of the assault. On January 9, 2024, Alonzo was sentenced to 2 years' incarceration and 18 months' post-release supervision for assault of a confined person and 2 years' incarceration for violation of a protection order. In June, Alonzo began his work release.

On August 13, 2024, the State filed a motion to terminate Alonzo's parental rights, alleging grounds for termination under Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016) and alleging that termination was in the best interests of Dream. A termination hearing was held regarding the motion in January 2025. Evidence was presented including testimony from numerous witnesses and the receipt of multiple exhibits.

Mikala Hines, the caseworker assigned to Dream since October 2023, testified that Alonzo made minimal progress toward his adjudicated conditions. Specifically, Hines testified that Alonzo had been incarcerated for the entirety of the case; services had not been met, meaning safety issues had not been addressed; and adjudicated issues had not been addressed. She also testified that Alonzo made inconsistent contact with Dream during the entirety of the case, as he only called her five to six times at her first placement, attempted to call her once at her second placement, and only one letter from Alonzo was passed along to Dream.

On July 19, 2024, the court ordered therapeutic parenting time. Alonzo participated in three therapeutic phone calls, all of which took place in July 2024, and one in-person therapeutic visit with Dream on August 7, even though he had the opportunity and was encouraged to attend more. Hines testified that Alonzo was discharged from a domestic violence/batterer's intervention program due to a lack of participation, after which he reenrolled, but at the time of the termination hearing he was one missed class away from being discharged again. She also testified that while incarcerated, Alonzo received a second degree assault charge against a confined person.

Erica Reutter, Dream's therapist, recommended that Dream and Alonzo have consistent contact, but Alonzo was inconsistent with his level of contact with Dream. Reutter observed that Dream had behavioral outbursts and difficulty regulating her emotions because of the inconsistent contact. Dream began improving in June 2024, prior to the therapeutic phone calls and in-person visits between Dream and Alonzo. Reutter testified that during the time Dream had contact with her father for therapeutic phone and in-person visits, she observed a little bit more emotional dysregulation at home, but not at school. When Alonzo discontinued therapeutic contact, Dream had some emotional dysregulation for a short period of time. Dream inquired as to why the therapeutic phone calls and in-person visits with Alonzo stopped, and Reutter testified that they talked about it in therapy. Dream has since not requested any future contact with Alonzo. Reutter further testified that Dream needed permanency and stability, and that it was not in the best interests of Dream to maintain a parent/child relationship with Alonzo.

Alonzo testified to bringing Dream to Nebraska after the death of her mother. Dream's mother had resided in St. Louis, Missouri, and passed away in 2019. After she passed, Alonzo immediately went to St. Louis to take custody and care of Dream and bring her back to Lincoln. While he provided support for Dream, his girlfriend, J.S., also provided care for Dream and Alonzo testified that he had no concerns about the care J.S. provided.

Alonzo testified that he would be released from incarceration on May 31, 2025. He stated that he would be looking to provide housing for Dream and would be required to have a full-time job or seek employment following his release from incarceration.

Alonzo testified that the reason he stopped participating in his original domestic batterer's treatment was due to a lack of funds and not having transportation. When he began the new program, he missed meetings because he started working. Alonzo later testified he had transferred into a new class that did not require him to pay, and he was in good standing with the class. Alonzo did not specify whether he was starting the class over again or if his progress would be transferred over. However, Alonzo acknowledged that he understood the domestic violence/batterer's intervention class to be the one court-ordered class he was supposed to complete and at the time of the hearing he still had not completed it.

On cross-examination, Alonzo testified to having met with case workers and understanding what he needed to do to have custody of Dream again. He understood that he needed to maintain contact with Dream. Alonzo testified to having limited funds to contact Dream and he had to pay for calls to Dream while incarcerated. He acknowledged that it was his responsibility to make arrangements to communicate with Dream during his work release. Alonzo understood that he could write letters to Dream without a financial barrier and although he claimed to have written a few, he acknowledged that Dream only received one through Hines. Alonzo testified that he only attended one in-person therapeutic visit with Dream but then stopped attending because he started working. Alonzo never made any effort to work with Dream's therapist to arrange times for therapeutic visits to accommodate his work schedule. He had not seen Dream or had any communication with her since their one in-person therapeutic visit on August 7, 2024.

Following the termination hearing, the juvenile court acknowledged that Alonzo spent most of this case incarcerated, which impacted his ability to complete his rehabilitation plan. The court also recognized the recent efforts made by Alonzo in accessing classes and voicing his desire to be a better parent. However, the court found that he was unable to rehabilitate himself in a reasonable time and that his failure to make consistent meaningful contact with Dream, as was made available to him, had prevented him from being able to immediately parent her upon his release. The juvenile court found that given these instances, Alonzo had not corrected the issues needed, despite being provided with the means to do so. The juvenile court accordingly entered an order finding that the State proved by clear and convincing evidence the statutory grounds alleged in the motion for termination and that terminating Alonzo's parental rights was in Dream's best interests.

Alonzo now appeals.

ASSIGNMENT OF ERROR

Alonzo assigns that the juvenile court erred in finding that the termination of his parental rights was in Dream's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches the conclusions independently of the findings made by the juvenile court. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met, and, second, that termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

*Statutory Grounds for Termination.*

There are 11 statutory bases for parental termination under § 43-292. Only one must be met to provide for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Alonzo does not assign that the juvenile court erred in finding that statutory grounds existed under § 43-292(6) and (7). However, for the sake of completeness, we set out how § 43-292(7) was met.

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al., supra.*

The evidence demonstrated that Dream was placed in legal custody of DHHS and in an out-of-home placement on March 17, 2023, and has continuously remained in an out-of-home placement. At the time the State filed the motion to terminate, August 13, 2024, Dream had been placed outside the home for almost 17 months out of the most recent 22 months. Therefore, we determine that the State proved by clear and convincing evidence that Dream had been in an out-of-home placement for 15 or more months of the most recent 22 months when the State filed the motion to terminate Alonzo's parental rights.

*Best Interests.*

Alonzo challenges the finding that termination of his parental rights was in Dream's best interests. Alonzo argues that the State failed to prove by clear and convincing evidence that termination was in the best interests of Dream as (1) he addressed his substance abuse problems, (2) he participated in the domestic violence/batterer's program, (3) he gained employment, (4) he had a supportive family in the area willing to help him provide for Dream, (5) Dream demonstrated an attachment to his family in the area, and (6) he was about to be released from incarceration.

Generally, a child's best interests are presumed to be served by having a relationship with their parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proven that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means

a personal deficiency or incapacity which has prevented or will probably prevent performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests and parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

In determining whether a parent is unfit, the law does not require perfection; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

Upon our de novo review, we conclude that the State proved by clear and convincing evidence that terminating Alonzo's parental rights was in Dream's best interests.

The evidence shows that Alonzo made minimal progress in complying with his rehabilitative goals, despite services being continuously offered to him throughout his incarceration and work release. Throughout the case, Alonzo was offered supervised visitation and support services, including a domestic violence/batterer's intervention program. However, due to Alonzo's own decisions, he has been unable to provide consistent contact with Dream, and he has been unable to follow his rehabilitation plan within a reasonable time provided.

Since the beginning of the case, Alonzo was able to have telephone/video parenting time while he was incarcerated. However, between March 17, 2023, and March 21, 2024, Dream only received 5 to 6 calls from Alonzo. When Dream moved to her new foster home in February 2024, Alonzo attempted to call once, and when the call failed, he never called again. Since the start of the case, only one letter from Alonzo was received and passed along to Dream. When his work release began in late June 2024, he participated in 3 therapeutic phone calls in the month of July and 1 in-person therapeutic visit on August 7, but he did not attend subsequent appointments due to work. He did not notify Dream's therapist in advance that he would not attend, and he did not attempt to reschedule his missed appointments with Dream and her therapist. These were the only contacts Alonzo had with Dream during this case.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Incarceration itself may be involuntary as far as a parent is concerned, however the criminal conduct causing the incarceration is voluntary. *Id.* Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.*

Throughout the case, Alonzo expressed a desire to communicate with Dream but argued that consistent communication was difficult for a variety of reasons, including his incarceration. Alonzo was incarcerated due to violating a protection order, obstructing a peace officer, and having five outstanding warrants against him and this prevented him from being able to create consistent contact and provide permanency for Dream. While incarcerated, Alonzo prolonged his incarceration by assaulting another inmate, which led him to solitary confinement, where he was unable to communicate with Dream. During his work release, he did not increase his

communication with Dream or abide by his rehabilitation plan in a reasonable amount of time to support reunification.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require the termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or made to await uncertain parental maturity. *Id.* Alonzo has been unable to put himself in a position to properly parent his child. We recognize that while Alonzo has made some progress toward his goal of rehabilitation, there is still much progress that needs to be made before Alonzo could be trusted with Dream's care and custody.

Dream deserves permanency. Alonzo's failure to comply with the court-ordered rehabilitation plan defeated his chance of being reunified with her. Dream has been suspended in foster care since March 2023 in this case and deserves stability and security in her life. She should not languish in foster care awaiting uncertain parental maturity. Accordingly, based on our review of the evidence, we agree with the juvenile court that the termination of Alonzo's parental rights is in Dream's best interests.

CONCLUSION

We conclude the State proved by clear and convincing evidence that a statutory ground to terminate Alonzo's parental rights to Dream existed under § 43-292(7), and that terminating his parental rights was in Dream's best interests. The juvenile court's order is affirmed.

AFFIRMED.